In re Joe Bettencourt BORGES, also known as Joe B. Borges, doing business as J & M Dairy, and Maria Rocha Borges, also known as Maria R. Borges, doing business as J & M Dairy, Debtors.

AG New Mexico, FCS, ACA, AG New Mexico, FCS, FLCA, and AG New Mexico, FCS, PCA, Plaintiffs–Appellants–Cross–Appellees,

v.

Joe Bettencourt Borges and Maria Rocha Borges, Defendants–Appellees–Cross–Appellants,

and

David Borges, a married man, dealing in his sole and separate estate, Frank Borges, a single man, Atkins Engineering Associates, Inc., a New Mexico Corporation, Cliff Waide, doing business as Waide Irrigation Service and Supply, United States of America, Internal Revenue Service, Pecos Valley Pump, Inc., a New Mexico Corporation, Jordan Dairy Service, LLC, a

New Mexico Corporation, CWBC, Inc., a New Mexico Corporation, and all Unknown Claimants of Interest, in the Premises Adverse to The Plaintiffs, Defendants–Appellees–Cross–Appellees,

In re Joe Bettencourt Borges, also known as Joe B. Borges, doing business as J & M Dairy, and Maria Rocha Borges, also known as Maria R. Borges, doing business as J & M Dairy, Debtors.

Joe Bettencourt Borges and Maria Rocha Borges, Plaintiffs–Appellees–Cross–Appellants,

v.

AG New Mexico, FCS, PCA, AG New Mexico, FCS, FLCA, and AG New Mexico, FCS, ACA, Defendants–Appellees–Cross–Appellees.

In re Joe Bettencourt Borges, also known as Joe B. Borges, doing business as J & M Dairy, and Maria Rocha Borges, also known as Maria R. Borges, doing business as J & M Dairy, Debtors.

Joe Bettencourt Borges and Maria Rocha Borges, Plaintiffs–Counter–Defendants–Appellees–Cross–Appellants,

v.

AG New Mexico, FCS, ACA, AG New Mexico, FCS, PCA, and AG New Mexico, FCS, FLCA, Defendants–Counter–Claimants–Appellants–Cross–Appellees,

and

National Milk Producers Federation, doing business as Cooperatives Working Together, Defendant.

BAP Nos. NM–13–005, NM–13–011, NM–13–006, NM–13–012, NM–13–007, NM–13–013.

Bankruptcy No. 10–12800.

Adversary Nos. 10–01170,

11–01012, 11–01105.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Filed April 8, 2014.

312

Richard F. Rowley II of Rowley Law Firm, LLC, Clovis, NM, for Appellants–Cross–Appellees.

Karla K. Poe (William J. Arland III and Aletheia V.P. Allen with her on the brief), of Arland & Associates, LLC, Albuquerque, NM, for Appellees–Cross–Appellants.

Before MICHAEL, NUGENT, and SOMERS, Bankruptcy Judges.

SOMERS, Bankruptcy Judge.

This group of consolidated appeals stems from a removed foreclosure action of a dairy in New Mexico. Embedded in them are three main issues: 1) whether a lien allegedly granted by a corrected mortgage that was not signed by the debtors can be avoided under 11 U.S.C. § 544;[1] 2) whether a lien on water rights was properly perfected under New Mexico law; and 3) whether the lender acted reasonably in enforcing the cross-collateral provision and insisting it receive all the proceeds from the proposed sale. After thoroughly reviewing the extensive record and considering the evidence as a whole, we are not persuaded by either parties' arguments on appeal and AFFIRM the bankruptcy court's decision in its entirety.

## I. Factual Background[2]

The debtors, Maria Borges and Joe Borges (now deceased), were dairy farm-

---

**1.** All future references to "Code," "Section," and "§ " are to title 11, United States Code, unless otherwise specified.

**2.** The bankruptcy court made very extensive findings of fact in its opinion. A complete recitation of those facts in this opinion is not necessary to disposition of these appeals, and

ers doing business as J & M Dairy (collectively the "Borgeses") in New Mexico. They operated the dairy with the assistance of two of their sons, Frank and David Borges.[3] They owned at least 557.33 acres of farm property located in Eddy County, New Mexico, which was used in the dairy operation. AG New Mexico, FCS, ACA ("ACA"), AG New Mexico, FCS, PCA ("PCA"), and AG New Mexico, FCS, FLCA ("FLCA") (collectively "AGNM") are federally chartered agricultural lenders. AGNM began making loans to the Borgeses in 2006. At issue are three promissory notes: 1) the Cow Note,[4] 2) the Equipment Note,[5] and 3) the Facility Note.[6] All three notes were cross-collateralized and contained cross-default provisions. The loans were secured by cattle, including any replacements, as well as by all milk and milk proceeds, all crops including hay and other feed, the farm equipment and any accounts receivable.[7] They were also secured by a Line of Credit Mortgage dated June 6, 2006 (the "2006 Mortgage") describing the property subject to the mortgage as 337.33 acres of Eddy County farm property, including "all riparian and water rights associated with the Property, however established."[8] The

2006 Mortgage was acknowledged and properly recorded in the Eddy County, New Mexico records on June 6, 2006.

AGNM also submitted three Change of Ownership of Water Right forms to the Office of the State Engineer for filing in accord with § 72–1–2.1 of the New Mexico Statutes Annotated.[9] The forms recited that "Ag New Mexico, FCS, ACA" was mortgagee and were acknowledged by the Borgeses, but lacked any attachments. The Change of Ownership of Water Right forms were subsequently recorded in the Eddy County Clerk's Office.

Advances on the loans were paid down by proceeds from milk production. The Borgeses sold their milk to the Dairy Farmers of America ("DFA"), who made out its checks payable jointly to the Borgeses and AGNM, twice a month. AGNM applied these "milk checks" first to the monthly mortgage payment on the Facility Note, then expenses and interests on the Cow Note, and finally to pay down the principal on the Cow Note. The milk checks usually averaged $200,000 to $400,000. These checks were the primary cash flow of the entire dairy operation and

thus what follows is a summary of the pertinent facts.

3. For convenience, we will refer to individual family members by their first name.

4. Trial Ex. 24, Cow Note, *in* Cross–Appellants' Appendix ("Boreses App.") 1670–72. This note is also known as "Note 56," "Operating Note," "Revolving Line of Credit Note," or "the LOC Note."

5. Trial Ex. 18, Equipment Note, *in* Borgeses App. at 1650–52. This note is also known as "Note 60" or "ITL Note."

6. Trial Ex. 14, Facility Note, *in* Borgeses App. at 1636–38. This note is also known as "Note 90," "the Real Estate Note," or "the FLCA Note."

7. Trial Ex. 16, Commercial Security Agreement dated June 6, 2006, *in* Borgeses App. at 1639–42; Trial Ex. 19, Commercial Security Agreement dated July 13, 2007, *in* Borgeses App. at 1653–155; Trial Ex. 23, Commercial Security Agreement dated May 29, 2008, *in* Borgeses App. at 1665–69.

8. Trial Ex. 15, 2006 Mortgage, *in* Appellants' Appendix ("AGNM App.") at 575–82.

9. Trial Exs. 8–13, New Mexico State Engineer Office Change of Ownership of Water Right forms, *in* AGNM App. at 593–610. These three forms generated four State Engineer File Numbers: RA–1094, RA–1326, RA–1327, and RA–1455. Some of the forms were submitted for filing on July 17, 2006, and some on December 5, 2006.

the life blood of the arrangement with AGNM.

During the first part of the decade, milk prices steadily rose, as well as demand for dairy protein. But by 2008, J & M Dairy was losing money due to the decrease in demand for milk and rise in feed costs. The other eleven dairies AGNM funded were also losing money.

In May 2008, the Borgeses sought to renew the Cow Note, which was set to mature on June 1, 2008, and requested a commitment increase from $5,575,000 to $6,500,000.[10] Funds had previously been spent to pay aged accounts payable and current operating expenses, remodel the milking barn, and purchase approximately 290 replacement cattle. The Borgeses wanted the commitment increased to pay off the majority of accounts payable and cover any unplanned shortfalls. On May 28, 2008, AGNM approved a six-month renewal of the Cow Note with a $6.1 million limit and a maturity date of December 1, 2008.[11]

By October 2008, due to continued operating losses (approximately $200,000 as of September 2008), the decline in milk prices, rise in feed costs, and the bleak outlook for dairy farmers, the Borgeses decided to get out of the dairy business and actively pursued brokers to sell their herd and facility. Their plan was to: 1) sell the herd by the end of the year and pay off the Cow Note, 2) take the excess proceeds from the sale of the herd to pay off their outstanding dairy bills, and continue making the mortgage payments on the Facility Note and payments due on a real estate contract for the purchase of an unrelated farm, 3) refinance the Facility Note with a lower interest rate and add two, unrelated farms to the payment, and 4) sell the dairy in 2009 and pay off the remaining two notes.[12] AGNM's plan was to assist the Borgeses accomplish their goal of paying off all their debts to it by "structur[ing] [the plan] for their benefit and ours."[13] At this point, everyone assumed that the proceeds from the sale of the dairy herd would be enough to pay off the Cow Note and cover the 2009 annual payment on the Facility Note.

While attempts to sell the herd were made, the Borgeses continued to request funds from AGNM to operate their dairy. On October 30, 2008, they requested a $250,000 optional advance.[14] AGNM's supervising company, Farm Credit Bank of Texas ("FCBT"), approved this request and required the Borgeses' loans be downgraded to a substandard "11A" rating due to "continued operating losses and the decision to discontinue operations, liquidate the herd and sell the facility."[15] The loans were downgraded on or about November 3, 2008. AGNM continued to advance funds to the Borgeses to maintain the collateral.[16]

---

10. Trial Ex. 20, Loan Analysis Comments dated May 20, 2008, *in* Borgeses App. at 1656–61.

11. Trial Ex. 24–A, Approval Notice and Loan Agreement dated May 28, 2008, *in* Borgeses App. at 1673–76; Trial Ex. 22, Email dated May 28, 2008, *in* Borgeses App. at 1664.

12. Trial Ex. 25, Email Thread dated Oct. 21–23, 2008, *in* Borgeses App. at 1677–80.

13. *Id.* at 1680.

14. Trial Ex. 26, Optional Advance Request dated Oct. 30, 2008, *in* Borgeses App. at 1681–82.

15. Trial Ex. 28, Email dated Nov. 3, 2008, *in* Borgeses App. at 1685; May 22, 2012 Trial Transcript ("Trial Tr."), Testimony ("Test.") of Bill Yoakum at 105–07, *in* Borgeses App. at 3782–84.

16. Regular timely feeding of the herd was essential to protecting the collateral's value as hungry cows produced less milk, and if the

On November 26, 2008, the Borgeses requested a thirty-day extension on the Cow Loan (from December 1, 2008 to January 1, 2009), anticipating that they would close on the sale of the herd by December 15, 2008.[17] That deal, however, failed for reasons not relevant to these appeals.

On December 9, 2008, the Borgeses requested another $250,000 optional advance, which AGNM approved.[18]

On December 22, 2008, the Borgeses advised AGNM that the dairy herd buyer had lowered the offer to a degree that it would barely pay off the Cow Note, they would prefer not to accept that offer (but would if they had to), and asked if AGNM would continue to stay with them and let them restructure the Facility Note to annual payments with a prime rate, possibly with interest only payments for two years, and refinance two farms being purchased under contract.[19] AGNM did not want to continue financing the Borgeses given the economy and the fact it could not find a loan participant to limit its exposure.[20] On December 24, 2008, Peggy Moncrief, the loan officer assigned to the Borgeses, recommended AGNM issue a 45-day distress letter to indicate that AGNM was losing patience with them.[21] At this point, Moncrief believed Maria had not told her the truth about the offer amount and when it expired.[22] She told Maria that AGNM wanted the Cow Note paid off and would not consider restructure of the Facility Note until the Cow Note was paid off. Later that day, AGNM sent the Borgeses a distress letter: 1) declaring the Cow Note loan was or may be distressed, 2) advising they had 45 days from the date of the letter to obtain restructuring, and 3) warning that AGNM might elect to begin foreclosure action.[23]

On December 30, 2008, the Borgeses requested a third $250,000 optional advance, as well as an extension to February 1, 2009.[24] Two potential buyers were scheduled to look at the herd on January 5, 2009. If the Borgeses could not sell the entire herd soon, their plan was to sell half of the herd to pay down the Cow Note. AGNM approved the advance and the extension.[25]

On January 6, 2009, the Borgeses requested an optional advance for $130,000, which was approved subject to the following additional conditions: 1) they agreed

---

cows stopped producing milk altogether, they became less valuable "beef cows." May 29, 2012 Trial Tr., Test. of Maria Borges at 55–56, *in* Borgeses App. at 4447–48.

**17.** Trial Ex. 30, Extension Agreement, *in* Borgeses App. at 1687; Trial Ex. 31, Loan Analysis Comments dated Nov. 26, 2008, *in* Borgeses App. at 1688.

**18.** Trial Ex. 32, Optional Advance Request dated Dec. 9, 2008, *in* Borgeses App. at 1689–91.

**19.** Trial Ex. 34, Email Thread dated Dec. 22–23, 2008, *in* Borgeses App. at 1695–97.

**20.** *Id.*

**21.** Trial Ex. 35, Email dated Dec. 24, 2008, *in* Borgeses App. at 1698.

**22.** *Id.* Maria had previously told Moncrief that the offer was $1160/cow, but the broker told Moncrief the offer was for $1350/hd with 20% kickout on the cows and $1000/hd on the heifers.

**23.** Trial Ex. 36, Letter dated Dec. 24, 2008, *in* Borgeses App. at 1699–70.

**24.** Trial Ex. 37, Optional Advance Request dated Dec. 30, 2008, *in* Borgeses App. at 1701–02; Trial Ex. 38, Loan Analysis Comments dated Dec. 30, 2008, *in* Borgeses App. at 1703–04.

**25.** Trial Ex. 44, Optional Advance Loan Agreement dated Jan. 2, 2009, *in* Borgeses App. at 1770–72; Trial Ex. 45, Extension Agreement, *in* Borgeses App. at 1773.

to submit a current list of all accounts payable; 2) they would not request an advance in excess of the milk check; and 3) they would submit a reasonable offer to the National Milk Producers Federation dba Cooperatives Working Together ("CWT") buyout program.[26] The Borgeses requested and were approved for a $340,000 optional advance on January 14, 2009, and another $340,000 on January 20, 2009.[27]

On January 25, 2009, the Borgeses advised AGNM that they had met with a broker who had a buyer for the whole dairy herd and were negotiating terms for "$1600/milk and dry cow[,] [w]ith a 10% kickout." [28] A few days later, they met with AGNM, estimated they would net approximately $8.5 million from the sale after commission, and proposed the following to AGNM: 1) they would pay off the Cow Note and all of their payables with $7 million of these funds, 2) AGNM would loan them $5.3 million, secured by the dairy and two additional farms, 3) they would use the $5.3 million to pay off the Facility Note (approximately $3 million) and pay off the first lienholders on the two farms (approximately $1 million), and 4) the remaining $2.8 million would be used

to purchase approximately 2000 head of cows and operate the dairy.[29] AGNM's response was that it would look at the proposal and put together a cash flow analysis to see if 2,000 cows could service a $5.3 million debt, but that it first needed a copy of the contract to sell the cattle at these figures.

On January 30, 2009, the Borgeses requested a $234,000 optional advance and an extension. AGNM approved the advance but not the extension.[30] On February 18, 2009, the Borgeses requested a $165,000 advance and extension to March 1, 2009; both were approved.[31] By this time, it became obvious the "$8.5 million deal" had not been made or had disintegrated. But another buyer, Jackie Corley, Steve Corley, and Devine Farms 10, LLC (collectively "Corley"), had surfaced.

On February 25, 2009, AGNM approved and advanced the Borgeses $310,000 to "preserve our collateral until sufficient time for [ ] Plan A–C to take place." [32] Plan A involved selling the entire herd to Corley and having a contract in place by February 27, 2009; Plan B involved selling a part of the herd to Lowell Craig or Sebasio Faria;[33] and Plan C was a disbursal sale.

---

**26.** Trial Ex. 47, Optional Advance Request dated Jan. 8, 2009, *in* Borgeses App. at 1775; Trial Ex. 48, Loan Agreement dated Jan. 7, 2009, *in* Borgeses App. at 1776–78.

**27.** Trial Ex. 49, Optional Advance Request dated Jan. 14, 2009, *in* Borgeses App. at 1779–80; Trial Ex. 50, Loan Agreement dated Jan. 20, 2009, *in* Borgeses App. at 1781–82.

**28.** Trial Ex. 51, Email Thread dated Jan. 25–26, 2009, *in* Borgeses App. at 1783–85.

**29.** Trial Ex. 53, Email Dated Jan. 27, 2009, *in* Borgeses App. at 1789. The Borgeses made this proposal to avoid a tax liability when the cattle were sold.

**30.** Trial Ex. 55, Optional Advance Request dated Jan. 30, 2009, *in* Borgeses App. at 1792.

**31.** Trial Ex. 62, Optional Advance Request dated Feb. 18, 2009, *in* Borgeses App. at 1805–06; Trial Ex. 63, Loan Agreement dated Feb. 19, 2009, *in* Borgeses App. at 1807–08; Trial Ex. 64, Extension Agreement, *in* Borgeses App. at 1809.

**32.** Trial Ex. 73, Loan Analysis Comments dated Feb. 25, 2009, *in* Borgeses App. at 1827–29.

**33.** Craig and Faria had previously purchased cattle from the Borgeses. Both had expressed interest in buying more cattle, but not the entire herd. Faria was the buyer whose offer was rejected in December 2008.

### The Corley Deal

Initially, Corley expressed interest in purchasing the entire herd as well as the facility. He contacted AGNM and discussed obtaining 100% financing for the facility, and if that was possible, then also borrowing money to purchase the herd.[34] Corley indicated that even if AGNM did not finance the facility, he was still interested in buying the herd and had the funds to purchase the herd.[35] AGNM declined to finance Corley.

On February 25, 2009, the Borgeses and Corley executed a contract that stated Corley agreed to buy the herd for $7.6 million (the "Contract").[36] This deal, however, was more complicated than as portrayed in the Contract. Corley did not have access to sufficient funds to purchase the herd, so he and Maria made arrangements for the use of the dairy's assets to facilitate the sale of the herd, similar to a leveraged partial buyout. First, the Borgeses assigned the milk checks to Corley, beginning March 1, 2009.[37] Second, Corley was to 1) lease the dairy facility beginning about the middle of March,[38] 2) use the dairy to both maintain the cows and milk production, and 3) sell off as much of the herd as necessary to pay AGNM enough to obtain a lien release on the remaining cattle. The sales that would make up the liquidation of the herd were to be through an escrow arrangement managed by a title company. And after the sale of the herd, Maria expected that she and AGNM would reach an agreement on a lower interest rate on the Facility Note. With a payoff of about $6.3 million on the Cow Note, Maria expected to receive $1.3 million at closing, enough to pay most of her accounts payable and maintain a farming operation. Sometime after the completion of the sale and shipping of the herd, the temporary lease of the dairy would end. At that point, the dairy facility could be sold to retire more AGNM debt.

Around this time (before the scheduled closing), Brett Bynum,[39] the broker the Borgeses worked with in January but was now out of the picture, contacted AGNM to inquire about the proposed sale to Corley. He told Moncrief that the Borgeses had wanted him to give AGNM a contract for $4.1 million, when the contract was supposed to have been $7.1 million.[40] These allegations put AGNM on "high alert."[41] Bynum later sued the Borgeses and AGNM, among others, for commis-

34. Trial Ex. 69, Email Dated Feb. 23, 2009, *in* Borgeses App. at 1817.

35. Trial Ex. 71, Email Thread dated Feb. 23, 2009, *in* Borgeses App. at 1820–24.

36. Trial Ex. 74, Contract to Buy Cows dated Feb. 25, 2009, *in* Borgeses App. at 1830.

37. Maria Borges testified that she told her son, Frank, to call the co-op and assign the milk checks to Corley. May 25, 2012 Trial Tr., at 81–82, *in* Borgeses App. at 4309–10.

38. Trial Ex. BB, Lease Agreement for Month to Month App. at 3211–12.

39. Bynum has also been referred to as Brett Bybee.

40. Trial Ex. AA, Email dated Mar. 2, 2009, *in* Borgeses App. at 3207. Bynum allegedly told AGNM that the Borges had asked him to sell the herd for $7.1 million but to provide a fake contract to AGNM showing a sale for only $4.1 million. The bankruptcy court noted that although this story was debatable, the important point was that it generated anxiety at AGNM about the loan and the disposition of its collateral. Memorandum Opinion After Trial on the Merits In Support of Judgment and Award of Related Relief at 16 n. 14, *in* AGNM App. at 443; Ex. AA, Email dated Mar. 2, 2009, *in* Borgeses App. at 3207.

41. May 21, 2012 Trial Tr., Test. of Dale Moorman at 34, *ll*. 6–8, *in* Borgeses App. at 3654 ("[that e-mail] kind of put us on what I would call high alert in watching this sales transaction[.]").

sions he claimed he was owed for his efforts putting a sale of the herd together. He served them with a temporary restraining order on March 11 or 13, 2009.

AGNM received a copy of the Contract late on March 10, 2009.[42] The closing was set for Friday, March 13, 2009. The Borgeses essentially gave AGNM a little more than 60 hours to analyze and react to the proposed deal. The Borgeses anticipated that AGNM would provide a payoff figure of $6.3 million on the Cow Note. AGNM's upper management, however, provided a payoff figure for all three loans. On the eve of the scheduled closing, AGNM faxed a single payoff figure of $9.4 million to Phil Brewer, Corley's closing agent/attorney.[43] In reply, Brewer faxed a letter to the title company and the attorneys for AGNM, the Borgeses, and Bynum, calling the deal off and stating his client would not be at the closing because "all of the purchase price to be paid by Devine Farms would be subsumed in the [AGNM] payoff with no funds available to pay the calf raiser with possessory security interest in the calves being purchased, clear title to the assets covered by the sales contract [ ] cannot be delivered." [44]

On the day of the scheduled closing, AGNM and Maria gathered at the title company for the closing (either unaware of Brewer's letter or hoping Brewer had been bluffing).[45] John Logsdon, AGNM's Senior Vice President/CCO, pulled Maria aside and presented her with a letter from AGNM that told her—other than some relatively small items to be reserved to pay certain obligations and the allowance to her of certain non-closing proceeds, the proceeds of the sale were to go to AGNM in their entirety.[46] Extremely angry, Maria stormed out of the meeting with Mr. Logsdon, and headed back to the dairy. Needless to say, the closing never took place.

### The CWT Sale

The Borgeses eventually liquidated the herd through CWT's Herd Retirement Program, a nationwide program that paid dairies to stop producing milk, send their cattle to slaughter, and stay out of the dairy business for at least a year. Maria submitted a bid that AGNM thought imprudent (too high), but it was accepted.

---

**42.** Trial Ex. BB, Email dated Mar. 10, 2009, *in* Borgeses App. at 3208–13.

**43.** Trial Ex. 105 at 2–3, AGNM Payoff Fax, *in* Borgeses App. at 1913–14.

**44.** Trial Ex. 105 at 1, Brewer [Deal's Dead] Letter dated Mar. 13, 2009, *in* Borgeses App. at 1912. Subsequently, Corley approached AGNM with a conditional offer to purchase the herd and all the milk checks from March 1, 2009 onward for $6.8 million. AGNM was willing to accept this offer, but Corley could not come up with the money as soon as AGNM needed, so there was no sale of any sort to him.

**45.** The testimony regarding what happened at the closing conflicted. Maria testified that her attorney called her while she was on her way to the closing at the title company and told her Brewer had voided the contract, so she turned around and went home. May 25, 2012 Trial Tr., Test. of Maria Borges at 120–25, *in* Borgeses App. at 4348–53. She stopped by Brewer's office and saw Moorman, Moncrief, and John Logsdon coming out of there, so she left and went to her attorney's office. She testified that she had no contact with AGNM on March 13, 2009. *Id.* at 124, *in* Borgeses App. at 4352. Messrs. Logsdon and Moorman testified they met with Maria on March 13, 2009.

**46.** Trial Ex. X, AGNM Letter dated Mar. 13, 2009, *in* Appellant–Cross–Appellee AGNM's Supplemental Appendix ("AGNM Supp. App.") at 40. Maria testified the side conference with Logsdon occurred on March 11, 2009, not on March 13, 2009. May 29, 2012 Trial Tr., Test. of Maria Borges at 163–65, *in* Borgeses App. at 4555–57. This factual dispute is immaterial.

The proceeds from the retirement of the herd totaled approximately $5.2 million. AGNM received approximately $1.2 million in June 2009, but CWT held the remaining proceeds because a dispute arose between the Borgeses and AGNM as to its dispersal.[47] The Borgeses insisted that AGNM did not have a lien on these proceeds and requested CWT send them a check payable to them only, while AGNM asked any proceeds checks be payable to AGNM and the Borgeses jointly.

### The Corrected Mortgage

Anxious given the loan quality downgrade, the Bynum suit, and the proposed liquidation, AGNM began examining its collateral position. AGNM discovered that the legal description attached to the 2006 Mortgage did not include 220 acres of farmland attached to the dairy facility (the "Additional 220 Acres") which both AGNM and the Borges had intended to include at the time it was signed. To fix this, AGNM unilaterally took the original mortgage, covered up the recording notations on the first page, added additional pages to the legal description to include the Additional 220 Acres, added " * *Corrected* * " to the first page (so the title of the document read "Corrected Line of Credit Mortgage"), and filed "the Corrected Mortgage" with the appropriate county clerk's office on March 13, 2009. AGNM did not try to obtain signatures from either of the Borges. AGNM took no further action to deal with the defective legal description other than to foreclose on the modified mortgage.

### Interests on the Cow Note Retroactively Increased

The Cow Note was extended several times through July 1, 2009. This was done in major part to preserve the collateral.

At some point, AGNM informed Maria that it was raising the interest rate on the Cow Note from 3.55% per annum to 6.01%, retroactively from January 2009. AGNM demanded that Maria assent to the interest increase as a condition of continuing to receive advances for feed and payroll, and she begrudgingly did. This increase was based on AGNM allegedly declaring the Cow Note in default on the ground that it was concerned it might not get paid in full.[48] But AGNM did not notify Maria of the declaration of default at the time it was purportedly made.

### The Foreclosure Action, The Avoidance Action, and The Turnover Action

AGNM placed the Cow Note on nonaccrual status on August 14, 2009. It then filed a complaint for money due and for foreclosure against the Borgeses and others in state court on August 28, 2009. AGNM sought a judgment establishing the debts owed to it and permitting it to foreclose or otherwise collect on its collateral, which included: the CWT proceeds, the dairy facility and adjacent farmland mortgaged or pledged to AGNM (including the water rights), and the milk proceeds. AGNM also claimed 1) the right to monies in a "Funds Held" account (approximately $450,000) received from cattle sales and

---

**47.** Trial Ex. 263, CWT Letter dated Aug. 21, 2009, *in* Borgeses App. at 2443.

**48.** The evidence regarding when and even if a default was declared on the Cow Note was conflicted. *See* Memorandum Opinion After Trial on the Merits In Support of Judgment and Award of Related Relief at 23 n. 19, *in* AGNM App. at 450; Trial Ex. 24, Cow Note at 2, *in* Borgeses App. at 1671, recites in part:

Default: I will be in default if . . . (3) I fail to pay, or keep any promise on any debt or agreement I have with you or with any of your
Affiliates; . . . (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you[.]

milk proceeds but not yet applied to reduce the amount owed on the notes; and 2) application of $1,000 of FLCA stock to repay the debt owed to it. The Borgeses answered and raised affirmative defenses and counterclaims against AGNM.

The Borgeses filed their joint Chapter 11 petition on June 1, 2010, and removed the state foreclosure action to the bankruptcy court (the "Foreclosure Action").[49] The Borgeses then filed an adversary proceeding against AGNM to avoid its liens on the Additional 220 Acres and the water rights (the "Avoidance Action")[50] and another proceeding, against AGNM and CWT, to turn over the CWT herd sale proceeds (the "Turnover Action").[51] In August 2011, CWT deposited slightly over $4 million into the bankruptcy court's registry.[52]

The Borgeses also objected to AGNM's proofs of claim. The parties stipulated to consolidating the foreclosure and avoidance proceedings.[53]

In September 2011, the bankruptcy court granted partial summary judgment to AGNM, finding:

> all three Plaintiffs have a security interest in the CWT funds and that [PCA] holds a perfected security interest in the

CWT funds. Plaintiffs [ACA] and [FLCA] have not made a sufficient showing that their security interests in the CWT funds are perfected.[54]

The bankruptcy court, however, declined to award the registry funds to AGNM because the issue of whether AGNM was owed anything at all was not and could not be decided on summary judgment. The parties then filed several motions for summary judgment, but because the trial was set less than a month away, the court deemed them trial briefs and deferred ruling on them.[55]

A trial commenced on May 21, 2012 and concluded on May 31, 2012. The bankruptcy court issued its decision and judgment on December 31, 2012 (the "Appealed Order").[56] Ultimately, the bankruptcy court allowed AGNM's proofs of claim and awarded it judgment on the notes subject to some offsets. It concluded that AGNM (specifically PCA) was entitled to the CWT proceeds. It also determined that AGNM had a valid lien on the real estate described in the 2006 Mortgage and could foreclose on that property, but not on the Additional 220 Acres as the Corrected Mortgage was void. It further held that AGNM had no interest in any water rights

---

49. Notice of Removal of State Court Action, *AGNM v. Borges (In re Borges)*, Adv. Case No. 10–1170, *in* Borgeses App. at 100–03.

50. Debtors' Complaint to Determine the Validity and Extent of Liens, to Avoid Liens Claimed By [AGNM], To Avoid a Fraudulent Transfer and For Turnover, *Borges v. AGNM (In re Borges)*, Adv. No. 11–1012, *in* Borgeses App. at 4818–25.

51. *Borges v. AGNM (In re Borges)*, Adv. No. 11–1105 Docket, ECF No. 1 at 6–7, *in* Borgeses App. at 70–71.

52. Clerk's Notice of Registry Deposit, *Borges v. AGNM (In re Borges)*, Adv. No. 11–1105 Docket, ECF No. 10, *in* Borgeses App. at 72.

53. Stipulated Order Consolidating Adversary Proceedings, *in* Borgeses App. at 433–35. For all intents and purposes, this meant all three adversaries were consolidated since the Turnover Action mirrored the Foreclosure Action's claim as to the CWT proceeds.

54. Memorandum Opinion In Support of Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment at 21, *in* AGNM App. at 300.

55. Interim Order Deferring Rule on Motions for Summary Judgment, *in* AGNM App. at 376–79.

56. Appealed Order, *in* AGNM App. at 428–538; Judgment, *in* AGNM App. at 538–43.

represented by the Change of Ownership of Water Right documents recorded in the New Mexico State Engineer's Office (RA–1326, RA–1327, RA–1455, and RA–1094), and ordered the liens on these water rights avoided and preserved for the estate. Finally, it denied the Borgeses' counterclaims, concluding that AGNM's insistence on its contractual right to have all of the proceeds from the sale of the herd was reasonable and that its actions were entirely justified under the circumstances.[57] These appeals followed.

## II. Appellate Jurisdiction and Standards of Review

We have jurisdiction over this appeal. The orders from which the parties appeal are final for purposes of appeal, and the parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the District of New Mexico.[58]

"For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo*), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')."[59] *De novo* review requires an independent determination of the issues, giving no special weight

to the bankruptcy court's decision.[60] A factual finding is "clearly erroneous" when "it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made."[61] "Under the abuse of discretion standard: 'a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'"[62] Because multiple standards of review apply in this case, we will identify the applicable standard of review for each error alleged by the parties below on an issue-by-issue basis.

## III. Discussion

AGNM argues the bankruptcy court erred in its determination that: 1) the Borgeses are entitled to avoid AGNM's claimed lien on the Additional 220 Acres under § 544(a)(3) because the Corrected Mortgage was ineligible for recording and thus did not provide constructive notice to a hypothetical bona fide purchaser of AGNM's interest on the Additional 220 Acres, and 2) AGNM had no interest in any water rights represented by the Change of Ownership Forms and that AGNM's security interest in the water

---

**57.** Technically, the breach of contract counterclaim was granted in part, but relief was granted by reducing accrued interest included in AGNM's proof of claim on the Cow Note.

**58.** 28 U.S.C. § 158(a)(1) & (c)(1); Fed. R. Bankr.P. 8001–8002; 10th Cir.BAP L.R. 8001–3; *see Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (order is final if it " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' ") (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

**59.** *Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996).

**60.** *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

**61.** *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir.1990) (internal quotation marks omitted).

**62.** *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir.1994) (quoting *McEwen v. City of Norman*, 926 F.2d 1539, 1553–54 (10th Cir.1991)).

rights should be avoided under § 544(a).[63] The Borgeses claim the bankruptcy court erred in four ways: 1) finding that AGNM acted reasonably in its transactions with them, 2) dismissing their counterclaims, 3) rejecting their affirmative defenses, and 4) incorporating postpetition interest in its calculation of the judgment amount.[64]

## A. Avoidance of the Liens on the Additional 220 Acres and Water Rights.

We review the bankruptcy court's determination that the liens on the Additional 220 Acres and water rights claimed by AGNM may be avoided under § 544 *de novo*.[65] For the following reasons, we affirm.

### 1. Debtors in Possession May Avoid Unperfected Liens Under § 544(a).

The Borgeses, as debtors in possession, sought to avoid AGNM's claimed mortgage lien on the Additional 220 Acres and the water rights under § 544(a), which provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any actual knowledge of the trustee or of any creditor, the rights and powers of, or may avoid a transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, wether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

■ "The trustee's power to avoid transfers under this provision of the bankruptcy code is known as the 'strong arm' power."[66] Under this power, a bankruptcy trustee can avoid a mortgage lien if it could be avoided by a hypothetical bona fide purchaser ("BFP") of the real property.[67] "This power arises regardless of any actual knowledge the trustee or debtor in possession has of the transfer."[68] Generally, under § 544(a)(1) and (2), unperfected security interests in the debtor's personal property may be avoided, and under § 544(a)(3), unrecorded mortgages of real

---

63. *See* AGNM's Statement of Issues to be Presented on Appeal, *in* AGNM App. at 554–55.

64. Borgeses' Statement of Issues to be Presented on Appeal, Case No. 10–1170, Doc. No. 218.

65. *Hamilton v. Wash. Mut. Bank FA (In re Colon)*, 376 B.R. 33, 35 (10th Cir. BAP 2007) (the issue of lien avoidance under § 544 is a mixed question of law and fact that is reviewed *de novo*), *rev'd on other grounds*, 563 F.3d 1171 (10th Cir.2009) (citing *Lindquist v.*

*Household Indus. Fin. Co. (In re Vondall)*, 364 B.R. 668, 670 (8th Cir. BAP 2007)).

66. *Hamilton v. Washington Mut. Bank, FA (In re Colon)*, 563 F.3d 1171, 1174 (10th Cir. 2009).

67. *Id.* at 1173–74. A BFP is a person who buys without notice.

68. *Crowder v. Crowder (In re Crowder)*, 225 B.R. 794, 796 (Bankr.D.N.M.1998).

property may be avoided. The Borgeses, as Chapter 11 debtors in possession, could exercise the rights and powers of a trustee under § 544(a).[69] "Thus the bankruptcy code imposes a fiction on the debtor-in-possession, who likely has actual knowledge of any transfers the debtor made, in order to give the trustee, or debtor-in-possession with the powers of a trustee, the ability to avoid certain transfers for the benefit of the bankruptcy estate."[70] "The status and rights of the hypothetical … BFP are determined by state law."[71]

■■■ Notice to a person which will preclude BFP status may be actual or constructive.[72] Constructive notice includes both record notice, such as that provided by the recording acts, and inquiry notice, arising from facts as ought to put a prudent person upon inquiry as to the title.[73] As to inquiry notice, the New Mexico Supreme Court has stated:

> where the facts brought to the knowledge of the intending purchaser are such that in the exercise of ordinary care he ought to inquire, but does not, and his failure to do so amounts to gross or culpable negligence, he will be charged with a knowledge of all the facts which the inquiry, pursued with reasonable diligence, would have revealed.[74]

**2. The Lien Claimed by AGNM on the Additional 220 Acres May Be Avoided.**

■■■ The Borgeses contended that because the recording of the Corrected Mortgage was improper and did not give constructive notice of the lien to a hypothetical BFP under New Mexico law, AGNM's claimed lien on the Additional 220 Acres should be avoided. AGNM responded that the parties intended the Additional 220 Acres to be subject to the 2006 Mortgage and, although the 220 acres was omitted from the legal description when the 2006 Mortgage was recorded on June 6, 2006, this oversight was corrected by the recording of the Corrected Mortgage on March 13, 2009. The bankruptcy court held that the Borgeses were entitled to avoid the lien on the Additional 220 Acres allegedly granted by the Corrected Mortgage under § 544(a)(3) because under New Mexico law, the Corrected Mortgage did not provide constructive notice to a hypothetical BFP.[75] We agree with the bankruptcy court's analysis.

■■■ Under New Mexico statutory law, a purchaser for value without notice of an encumbrance takes the property free and clear. The recording acts address constructive notice, which is the focus under § 544(a)(3). N.M. Stat. Ann. § 14–9–1 provides that "[a]ll deeds, mortgages, … and other writings affecting title to real estate shall be recorded in the office of the county clerk of the county or counties in which the real estate affected thereby is situated."[76] N.M. Stat. Ann. § 14–9–2 provides the recording "shall be notice to all the world of the existence and contents

---

**69.** 11 U.S.C. § 1107(a).

**70.** *In re Crowder,* 225 B.R. at 796.

**71.** *In re Colon,* 563 F.3d at 1174.

**72.** *Grammer v. N.M. Credit Corp.,* 62 N.M. 243, 308 P.2d 573 (1957); 77 Am.Jur.2d *Vendor and Purchaser* § 384 (2013).

**73.** 77 Am.Jur.2d *Vendor and Purchaser* § 384 (2013).

**74.** *Camino Real Enters., Inc. v. Ortega,* 107 N.M. 387, 758 P.2d 801, 802 (1988), *quoting Sawyer v. Barton,* 55 N.M. 479, 236 P.2d 77, 81 (1951).

**75.** *AG N.M., FCS, ACA v. Borges (In re Borges),* 485 B.R. 743, 765 (Bankr.D.N.M.2012).

**76.** N.M. Stat. Ann. § 14–9–1 (1978).

of the instruments so recorded from the time of recording."[77] This means that "[n]o deed, mortgage or other instrument in writing not recorded in accordance with Section 14–9–1 NMSA 1978 shall affect the title or rights to, in any real estate, or any purchaser ... without knowledge of the existence of such unrecorded instruments."[78] "The purpose of the statute is to prevent injustice by protecting innocent purchasers for value without notice of unrecorded instruments who have invested money in property."[79]

There is no question that the Corrected Mortgage was recorded in the real estate records of the county where the Additional 220 Acres is located. Resolution of this appeal therefore turns on the question of whether that recording was sufficient to give constructive notice of AGNM's interest in the Additional 220 Acres to a hypothetical purchaser for value. N.M. Stat. Ann. § 14–8–4 answers that question by providing, "Any instrument of writing duly acknowledged may be filed and recorded. Any instrument of writing not duly acknowledged may not be filed and recorded or considered of record, though so entered,"[80] unless included in the list of statutory exceptions, none of which apply here. "Acknowledged" is defined to mean "notarized by a person empowered to perform notarial acts."[81]

Here, the Corrected Mortgage was an altered copy of the 2006 Mortgage. The Corrected Mortgage was not signed by the parties, and accordingly the Corrected Mortgage did not contain notarized signatures. The signatures on the Corrected Mortgage were obtained in 2006, not in 2009 when the Corrected Mortgage was filed. The Corrected Mortgage may not be "considered of record," even though it was entered by the clerk. The New Mexico recording act therefore precludes a finding that recording the Corrected Mortgage gave constructive notice of AGNM's interest in the Additional 220 Acre parcel as required to remove the mortgage lien from the strong-arm powers of § 544(a)(3).

New Mexico case law confirms that an unacknowledged writing affecting title to real property, even though recorded, does not provide constructive notice. The rule has been applied to a deed which was altered after its acknowledgment,[82] an executory contract for the sale of real property,[83] and materialmen's liens.[84] An unacknowledged chattel mortgage also provides no constructive notice of its contents.[85]

AGNM makes three arguments in support of the contention that even if the Corrected Mortgage was not entitled to be recorded, the recording of the Corrected Mortgage nevertheless gave notice of AGNM's lien on the Additional 220 Acres. AGNM's first argument is that because the Corrected Mortgage appeared on its face to have been properly signed and acknowledged, a prospective purchaser had constructive notice from the recorded mortgage which triggered the duty to

77. N.M. Stat. Ann. § 14–9–2 (1978).

78. N.M. Stat. Ann. § 14–9–3 (1978).

79. *Jeffers v. Doel*, 99 N.M. 351, 658 P.2d 426, 428 (1982) (citing *Arias v. Springer*, 42 N.M. 350, 78 P.2d 153 (1938)).

80. N.M. Stat. Ann. § 14–8–4(A) (1978).

81. N.M. Stat. Ann. § 14–8–4(B) (1978).

82. *Scheer v. Stolz*, 41 N.M. 585, 72 P.2d 606 (1937).

83. *McBee v. O'Connel*, 16 N.M. 469, 120 P. 734 (1911).

84. *N.M. Props., Inc. v. Lennox Indus., Inc.*, 95 N.M. 64, 618 P.2d 1228 (1980).

85. *Vorenberg v. Bosserman*, 17 N.M. 433, 130 P. 438 (1913).

inquire as to AGNM's interest.[86] We reject this argument as contrary to N.M. Stat. Ann. § 14–8–4, quoted above, which requires acknowledgment for effective recording. Moreover, if the recorded Corrected Mortgage somehow gave rise to a duty of inquiry, such an inquiry would not have revealed a mortgage from the Borgeses to AGNM of the Additional 220 Acres. Under New Mexico law, a mortgage is a "conveyance of real estate, or some interest therein, defeasible upon payment of money or the performance of some other condition."[87] New Mexico has adopted the statute of frauds as part of its common law.[88] A mortgage is a conveyance of land and, as such, is within the statute of frauds.[89] A grant of a mortgage must be in writing.[90] In this case, there is no record evidence of a document satisfying the statute of frauds by which the Borgeses transferred a mortgage lien on the Additional 220 Acres to AGNM. The record discloses that such a mortgage, although perhaps intended, was never executed. The Corrected Mortgage, the only writing claimed to constitute a mortgage of the Additional 220 Acres, was not executed by the Borgeses. Thus, inquiry would not have revealed AGNM's claimed interest.[91]

AGNM's second argument is that the failure to have the Corrected Mortgage re-signed and re-notarized is a latent defect which does not defeat constructive notice. In support of this proposition, AGNM states "The majority rule is that a latent defect in the acknowledgment of an instrument does not prevent the recordation from affording constructive notice of its content."[92] AGNM provides no New Mexico authority adopting this rule, no argument as to why this rule would be consistent with New Mexico law, and no explanation of how this rule is not precluded by N.M. Stat. Ann. § 14–8–4, which unconditionally requires acknowledgment. Further, as explained above, constructive notice of the content of the Corrected Mortgage would not render a purchaser's interest in the Additional 220 Acres subject to AGNM's claimed lien since there is no document signed by the Borgeses actually making such a transfer.

AGNM's third argument is that re-recording without new signatures and a new acknowledgment to correct a clerical error is an accepted practice.[93] The sole authority cited is a bankruptcy case decided under Kansas, not New Mexico, law.[94] In

**86.** Brief of AGNM at 34.

**87.** *In re Finch,* 120 N.M. 658, 905 P.2d 198, 200 (1995) (quoting *Kuntsman v. Guaranteed Equities, Inc.,* 105 N.M. 49, 728 P.2d 459, 460 (1986)).

**88.** *Alvarez v. Alvarez,* 72 N.M. 336, 383 P.2d 581, 584 (1963) ("There can be no question that the statute of frauds was adopted in New Mexico as a part of the common law.").

**89.** 72 Am.Jur.2d *Statute of Frauds* § 77 (2014).

**90.** *Id.*

**91.** The absence of a writing conveying a lien on the Additional 220 Acres to AGNM constitutes an additional basis on which to affirm the bankruptcy court's ruling that the Borges-

es may avoid AGNM's claim to a mortgage lien thereon. *Richison v. Ernest Grp., Inc.,* 634 F.3d 1123, 1130 (10th Cir.2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court.").

**92.** Brief of AGNM at 35 (citing *Jonas v. Walgreen Ariz. Drug Co. (In re Wonderfair Stores Inc. of Ariz.),* 511 F.2d 1206, 1214 (9th Cir. 1975)).

**93.** Brief of AGNM at 36–37.

**94.** *Meis v. Fowler State Bank (In re Meis),* No. 10–13207, 2012 WL 4486916 (Bankr.D.Kan. Sept. 27, 2012).

that case, a mortgage was filed which stated the correct common address but the wrong section number for the legal address. The lender re-recorded a correction mortgage that included the correct section number. The bankruptcy court held that the recorded corrected mortgage imparted constructive notice of the lien under Kansas case law applying the doctrine of equitable mortgages, which the Kansas Supreme Court had applied under similar circumstances. AGNM cites no New Mexico cases adopting the equitable mortgage doctrine or applying it in circumstances similar to those before the panel. In addition, the change sought to be effected by the Corrected Mortgage in this case is more than a clerical error—it seeks to add 220 acres which were not otherwise described in the original document.

 Finally, AGNM argues that even assuming the Corrected Mortgage did not provide constructive notice to a hypothetical bona fide purchaser, other documents in the chain of title provided sufficient information to "excite the attention of a title searcher," such that a bona fide purchaser would have inquiry notice of AGNM's interest.[95] The documents referred to are the Change of Ownership of water rights forms recorded in the records of Eddy County, New Mexico, as well as the Office of the State Engineer. According to AGNM, these "forms demonstrate that on June 6, 2006, the same date that Borges [sic] executed the 2006 Mortgage in favor of AGNM, Borges [sic] were also intending to perfect AGNM's lien interest

in water rights as to the entire N½ of Section 20."[96] There is a factual problem with this position. The Change of Ownership forms only identified a change with respect to water rights to 172.8 acres in section 18 and 303.6 acres in section 20. Also, since under New Mexico water law, water rights may be transferred independent of the land to which they are appurtenant,[97] a change of ownership of *water rights* would not alert a prudent person to inquire as to AGNM's interest in the *land.*

Even if the Change of Ownership forms gave notice sufficient to invoke the duty of inquiry, for the reasons above, such inquiry would have revealed that the Borgeses did not convey a mortgage in the Additional 220 Acres to AGNM. Thus, we affirm the bankruptcy court's conclusion that the Borgeses may avoid the lien claimed by AGNM in the Additional 220 Acres.

### 3. The Lien on Water Rights May Be Avoided.

The bankruptcy court ruled that the Borgeses could avoid AGNM's claimed lien in water rights because AGNM did not satisfy the requirements of N.M. Stat. Ann. § 72–5–22, which provides that "no . . . assignment [of water rights] shall be binding, except upon the parties thereto, unless filed of record in the office of the state engineer[,]" and N.M. Stat. Ann. § 72–1–2.1, which defines the form for recording.[98] Two defects were identified: the Change of Ownership forms were filed on behalf of ACA, not AGNM; and the forms were not accompanied by a copy of a deed of trust or other conveyance. On

**95.** Brief of AGNM at 38.

**96.** *Id.* A section is 640 acres and a half section is 320 acres.

**97.** *Walker v. United States,* 142 N.M. 45, 162 P.3d 882, 890 (2007) (citing N.M. Stat. Ann. § 72–5–23 (1985)).

**98.** Appealed Order at 104–05, *in* AGNM App. at 532–33 (the bankruptcy court inadvertently cited "N.M.S.A.1978 § 72–5–22 (1953)" and "N.M.S.A. § 72–1–2.1 (1996)").

appeal, AGNM argues that the mortgage of water rights is not avoidable because it was perfected by recording the mortgage with the county clerk and that having so recorded the mortgage, it was not also required to record it with the state engineer. AGNM does not make the alternative argument that the bankruptcy court should be reversed because the documents it filed with the Office of the State Engineer complied with the statutory filing requirements established under New Mexico water law. The Borgeses respond that the bankruptcy court should be affirmed because AGNM is attempting to raise a new issue on appeal which cannot be a basis for reversal, and, in any event, the recording of a mortgage is insufficient to perfect a lien in water rights. For the reasons stated below, we affirm.

a. **AGNM did not assert that its interest in water rights was perfected by the recording of the mortgage until it filed its brief with this Court.**

 AGNM's complaint for money due and foreclosure, filed prepetition in state court but removed to the bankruptcy court, alleges the execution of the 2006 Mortgage, the recording and re-recording of the mortgage, that the mortgage is a first lien against the property described, and that "[i]n addition to the surface estate, the Plaintiff ... has a lien on the water rights appurtenant to the real estate described herein and is named as a co-owner of said water rights."[99] On January 1, 2011, the Borgeses filed an adversary complaint to determine the validity and extent of liens, to avoid liens claimed

by AGNM, and to avoid fraudulent transfers.[100] As to the water rights, the complaint alleged that "Ag New Mexico FCS, ACA claims to have a lien and ownership interest in Water Rights by virtue of three documents entitled Change of Ownership of Water Right, executed by plaintiffs on or about June 6, 2006," and that because those forms are defective the liens claimed in the water rights appurtenant to the real property were not properly perfected.[101] In response, AGNM contended that the change of ownership forms were in compliance with New Mexico law. As stated above, the bankruptcy court granted the Borgeses' complaint for avoidance of AGNM's claimed interest in water rights because AGNM had not filed change of ownership forms in compliance with N.M. Stat. Ann. § 72–1–2.1.[102]

AGNM's statement of issues on appeal does not include the allegation that the bankruptcy court applied the wrong legal standard for perfection of a lien on water rights. The stated issue regarding water rights is the following:

> The bankruptcy court erred when it held that Ag New Mexico had no interest in any water rights represented by the Change of Ownership of Water Rights documents recorded in the New Mexico State Engineer's Office ... and that Ag New Mexico's security interest in the water rights appurtenant to the real estate at issue should be avoided under 11 U.S.C. Section 544(a) on the basis that Ag New Mexico failed to perfect that

---

99. Complaint for Money Due and Foreclosure at 6, *in* AGNM App. at 27.

100. Debtors' Complaint to Determine the Validity and Extent of Liens, To Avoid Liens Claimed by [AGNM], To Avoid a Fraudulent Transfer and For Turnover, *in* Borgeses App. at 4818–25.

101. *Id.* at 3, 5, *in* Borgeses App. at 4820, 4822.

102. Appealed Order at 104–105, *in* AGNM App. at 532–33.

security interest[.] [103]

But AGNM's opening brief argues that "AGNM perfected its interest under the 2006 Mortgage . . . by duly recording the mortgage with the county clerk. . . . The recording of a mortgage . . . constitutes notice to any subsequent purchaser. . . . Water rights are real property under New Mexico law, and a mortgage on water rights is therefore treated the same as any other mortgage on real property." [104] Specifically, AGNM argues that recording of its mortgage in accordance with N.M. Stat. Ann. § 14-9-1 perfected its lien on the waters rights and the bankruptcy court erred when it found New Mexico statutes regarding the assignment of water rights applicable to the perfection of liens on water rights.

The Borgeses counter that "[AGNM's] Argument that Recordation of the 2006 Mortgage Perfected [AGNM's] Purported Interest in the 337 Water Rights Was Not Preserved" because it "only argued that the change in ownership forms properly perfected [AGNM's] interest in the water rights" to the bankruptcy court. [105] The Borgeses therefore contend that AGNM's "argument that the recorded 2006 Mortgage is sufficient to perfect AGNM's purported lien on the 337 Water Rights should not be considered on appeal." [106]

AGNM's response brief argues that it preserved its argument. We disagree. Our examination of the record shows that prior to filing its brief in this Court, AGNM never contended that its claimed lien in water rights was perfected by the recording of the mortgage. AGNM's argument to the contrary [107] relies solely on its statement in its response to the Borgeses' closing arguments brief on the avoidance claims which states that "the mortgage itself gives notice to third parties by its recordation in the county records." [108]

103. AGNM's Statement of Issues To Be Presented On Appeal at 2, ¶ 1, *in* AGNM App. at 555.

104. Brief of AGNM at 8–9.

105. Brief of Borgeses at 52, 54. The Borgeses refer to the water rights allegedly perfected by the filing of the 2006 Mortgage as the 337 Water Rights and those allegedly perfected by the Corrected Mortgage as the 220 Water Rights.

106. *Id.* at 55.

107. Reply Brief of AGNM at 48.

108. AGNM's Response to Closing Arguments in Support of the Borgeses' Counterclaims and Adversary Complaint and In Opposition to the Plaintiffs [AGNM's] Complaint and WA's Motion for Abandonment at 21–22, *in* Borgeses App. at 4777–78. The sentence relied on is in the following paragraph:

Based on the foregoing, the change of ownership with a technically incorrect name (Ag New Mexico, FCS, ACA) does not change the status of the security interest in favor of Ag New Mexico, FCS, FLCA. Filing the change of ownership for a security interest is not even permitted under the applicable regulation, and any incorrect information in the change of ownership form cannot defeat the security interest. Additionally, even if changes of ownership attaching mortgages were required to be filed with the OSE, New Mexico law is clear that the water rights at issue are appurtenant irrigation rights and transferred by operation of law. The filing of a change of ownership with a technically incorrect name cannot undo this conveyance. There was no evidence presented at trial of what documents or information was sent to the OSE, but whatever information was sent was sufficient since the OSE signed off on the change of ownership forms and sent them back to AG New Mexico. These are the same change of ownership forms which were filed by Ag New Mexico and which were admitted as exhibits at trial. *Furthermore, the mortgage itself gives notice to third parties by its recordation in the county records.* Finally the name on the change ownership (Ag New Mexico, FCS, ACA) was

AGNM argues that the bankruptcy court ruled on the issue when holding that AGNM was required to comply with the filing requirements for an assignment or change of ownership of water rights.

 In the Tenth Circuit, " '[a]n issue is preserved for appeal if a party alerts the district court to the issue and seeks a ruling." [109] The Tenth Circuit "will not consider a new theory advanced for the first time as an appellate issue." [110] The "vague and ambiguous" presentation of a theory to the district court does not preserve the theory as an appellate issue.[111] "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." [112] This rule operates to preserve the appellate structure, the relationship between appellate and trial courts.[113]

Application of this rule compels the conclusion that the theory of perfection of the water rights lien by recording in the real estate records was not preserved on appeal. The single sentence in AGNM's bankruptcy court reply brief that "the mortgage itself gives notice to third parties by its recordation in the county records" is the only instance where AGNM contends the theory of perfection was raised. But that statement is vague—it does not identify the subject of the notice allegedly given or the legal theory related to perfection. When read in context, it appears to be an argument in support of the sufficiency of the recording of the change of ownership forms. If the legal theory was raised, it certainly was not developed. The Borgeses did not respond to the alleged raising of the new theory in their reply brief, perhaps because they did not understand the sentence in the manner now urged by AGNM. There is nothing in the bankruptcy court decision indicating it considered and rejected the argument that a lien in water rights is perfected by filing in the real property records.

In addition to relying on the foregoing sentence, AGNM argues that its "arguments below are the same in substance as the arguments it makes on appeal." [114] But this argument starts from the premise that the sentence in its bankruptcy court brief relied upon as preserving the new theory was effective for this purpose. AGNM also argues that the bankruptcy court was alerted to the New Mexico statutes on which it now relies. This is true only because those statutes were considered when ruling on the validity of the lien on the real property, not because they were raised with respect to the water rights.

The overall course of the litigation refutes the argument that AGNM alerted the bankruptcy court to the new theory and sought a ruling on it. When initiating litigation with the Borgeses by filing the foreclosure action that was removed to the bankruptcy court, AGNM contended its water rights lien was perfected by the filings in the Office of the State Engineer. The Borgeses filed the avoidance action

---

clearly similar enough to the correct name (Ag New Mexico, FCS, FLCA) to give constructive notice to third parties that FLCA claimed an interest in the water rights. *Id.* (emphasis added).

**109.** *Ecclesiastes 9:10–11–12, Inc. v. LMC Holding Co.,* 497 F.3d 1135, 1141 (10th Cir. 2007).

**110.** *Id.*

**111.** *Id.*

**112.** *Hardeman v. City of Albuquerque,* 377 F.3d 1106, 1122 (10th Cir.2004) (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990)).

**113.** *Ecclesiastes,* 497 F.3d at 1142.

**114.** Reply Brief of AGNM at 48.

challenging this position. Throughout the bankruptcy litigation, AGNM claimed perfection by filing in the office of the State Engineer. The bankruptcy court ruled that the lien was not perfected by the filings in the office of the State Engineer.

**b. In the Tenth Circuit, an issue raised for the first time on appeal may be the basis for reversal only if there is plain error, and plain error is not present here.**

The Tenth Circuit has recently taken a narrow view of when legal theories not raised below may be the basis for reversal on appeal. In *Richison v. Ernest Group, Inc.*,[115] the Tenth Circuit thoroughly examined this question. Its analysis began with determining whether the new theory was waived or forfeited below. "If the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it."[116] "By contrast, if the theory simply wasn't raised before the district court, we usually hold it forfeited."[117] "'Waiver is accomplished by intent, but forfeiture comes about through neglect.'"[118]

If a theory is not raised through neglect there is a possibility of appellate review if there is plain error. The *Richison* court stated:

> Unlike waived theories, we will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result. To show plain error, a

party must establish the presence of (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.[119]

The plain error rule is a reformulation of prior case law holding that the appellate court "will reverse on the basis of a legal theory not previously presented to the district court when the correct resolution of that theory is beyond a reasonable doubt and the failure to intervene would result in a miscarriage of justice."[120] It preserves the "significant but limited job of our appellate system to correct errors made by the district court in assessing the legal theories presented to it, not to serve as a 'second-shot forum . . . where secondary, back-up theories may be mounted for the first time.'"[121] Under this rule, "parties have the opportunity not only to present whatever theory they desire in the district court, but also to explain why their substantial rights and the integrity of our judicial system justify undoing the work of that district court on the force of an argument they didn't present the first time around."[122] To reverse and remand on any lesser showing would be wasteful and an invitation to abuse. In civil cases, the appellant's satisfaction of the plain error standard "often proves to be an extraordinary, nearly insurmountable burden," and an appellant's failure to attempt to satisfy that burden—"the failure to argue for plain error and its application on appeal—[ ] marks the end of the

115. 634 F.3d 1123 (10th Cir.2011).

116. *Id.* at 1127.

117. *Id.* at 1128.

118. *Id.* (quoting *United States v. Zubia–Torres,* 550 F.3d 1202, 1205 (10th Cir.2008)).

119. *Id.* (citations omitted).

120. *Id.* (citing *Petrini v. Howard,* 918 F.2d 1482, 1483 n. 4 (10th Cir.1990)).

121. *Id.* at 1130 (quoting *Tele–Commc'ns, Inc. v. C.I.R.,* 104 F.3d 1229, 1233 (10th Cir. 1997)).

122. *Id.* at 1130–31 (internal quotation marks omitted).

road for an argument for reversal not first presented to the district court." [123] In this case, there is nothing in the record indicating that AGNM intentionally relinquished the legal theory of perfection through recording in the real estate records. Rather, the theory was not raised due to neglect, making the plain error rule applicable. Because AGNM did not argue that the plain error standard is satisfied, it has then, "hit the end of the road" as to the argument that the lien on water rights was perfected through the filing of the mortgage.

Even if AGNM had attempted to argue that plain error exists, it would have met with failure. The method of transfer and perfection of a lien on water rights under New Mexico law is open to serious question. The New Mexico Supreme Court has not ruled on the matter. There are no New Mexico statutes expressly addressing perfection of liens on water rights. AGNM's position is that because a water right is a real property interest, the execution of a mortgage and the recording of a mortgage in the real estate records is the appropriate and sole manner of creation and perfection of a lien on water rights appurtenant to real property. It argues that the bankruptcy court wrongly assumed, when holding that its interest was subject to avoidance because it had not complied with N.M. Stat. Ann. § 72–1–2.1 when filing its change of ownership forms, that a mortgage of water rights is an assignment of water rights. It cites N.M. Stat. Ann. § 72–5–22, applicable to surface water appropriations, for the proposition that under N.M. Stat. Ann. § 72–1–2.1, relating to ground water appropriations, an assignment of water rights means a present unconditional transfer of title, not the granting of a lien. The Borgeses reply

that the execution and recording of a mortgage is not sufficient to transfer and perfect a lien on water rights and that property law does not displace water law. They urge that in New Mexico, compliance with the statutes addressing the transfer of water rights is also required because otherwise the statutes would be superfluous. According to the Borgeses, to perfect a transfer of water rights, N.M. Stat. Ann. § 72–1–2–2.1 requires (1) the mortgagee to file a change of ownership form with the state engineer; (2) that the form be accompanied by a copy of the instrument of conveyance (in this case the mortgage); and (3) that a copy of the change of ownership form filed with the state engineer (which includes a copy of the mortgage) also be filed with the county clerk. We conclude that if the bankruptcy court erred in holding that AGNM failed to perfect its lien in water rights was erroneous, that error is not plain.

Further, even assuming the first three elements of (1) error, (2) that is plain, and (3) that affects substantial rights are present, there is no basis on which to find the fourth element—that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. The alleged error in issue affects only the rights of these parties.

AGNM's only argument which comes close to arguing satisfaction of the plain error rule is the assertion that "any doubt about whether the issue was adequately preserved should be resolved in favor of considering the issue on its merits because the correct application of the governing New Mexico statutes presents a pure question of law, the bankruptcy court ruled on the question, and proper resolution of the question is certain." [124] Factu-

---

**123.** *Id.* at 1131.

**124.** Reply Brief of AGNM at 50.

ally, this statement is erroneous since the bankruptcy court did not rule on whether perfection of a lien on water rights was through the recording of the mortgage in the real estate records. Further, as examined above, the proper resolution is not certain since there is no New Mexico precedent. Also, the authorities relied upon by AGNM as to why this panel should consider the new legal theory are not persuasive. The primary authority cited is *In re Steinberg*,[125] an unpublished Tenth Circuit BAP decision. But that case does not apply here. In *Steinberg*, the issue was raised below and the problem on appeal was that the bankruptcy court had declined to rule on it. The *Steinberg* court stated, "While appellate courts generally do not consider issues that have not been passed on by the trial court, we will consider the issue because BOA's ability to enforce the Note depends on [the alleged new issue]—a pure question of law."[126]

The two Tenth Circuit opinions cited by AGNM, *Geddes*[127] and *Trierweiler*,[128] were both decided before the Tenth Circuit's confirmation of the plain error rule in *Richison*. *Geddes* stated the rule to be "[b]ecause the issue was not raised below, we may consider it here only if the argument is purely a matter of law whose proper resolution is certain"[129] and reversed the district court on that basis. The *Richison* court identified *Geddes* as an opinion demonstrating that courts have not "always been so precise about applying the plain error/manifest injustice standard to newly raised legal theories" and then stated, "[b]ut, despite this imprecision, no case in this circuit has held that we may reverse based on 'purely legal' arguments in the absence of plain error."[130]

The *Richison* court did not discuss *Trierweiler*, thus it warrants further consideration. *Trierweiler* suggests a second avenue for permitting review of a forfeited issue-discretion of the appellate court when the issue concerns a purely legal question. It states, "[g]enerally, issues not argued before the district court will not be considered on appeal. However, in some circumstances, resolution of issues not raised below is justified."[131] It then quotes the United States Supreme Court statement that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."[132] The Tenth Circuit in *Richison* acknowledged this authority when stating, "Although the Supreme Court has advised us that there are 'circumstances in which a federal appellate court is justified in resolving an issue not passed on below,' the Court has consistently left the job of defining the bounds of such circumstances to the courts of appeals."[133] We understand the Tenth Circuit's confirmation of the plain error rule in *Richison*, decided after *Trierweiler*, as stating the standard we

125. 2013 WL 2351797 (10th Cir. BAP May 30, 2013).

126. *Id.* at *3 (footnotes omitted).

127. *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919 (10th Cir.2006).

128. *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir.1996).

129. *Geddes*, 469 F.3d at 931.

130. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128–29 (10th Cir.2011) (citations omitted).

131. *Trierweiler*, 90 F.3d at 1538 (citations omitted).

132. *Id.* (quoting *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).

133. *Richison*, 634 F.3d at 1128 n. 2.

must apply when determining if a new issue (which was forfeited rather than waived) may be considered. As discussed above, AGNM has not satisfied the elements of the plain error rule.

For the foregoing reasons, we affirm the bankruptcy court ruling that the interest of AGNM in water rights may be avoided under § 544(a). AGNM's arguments in support of reversal rely upon an issue of law that was not presented to or ruled on by the bankruptcy court. AGNM has not shown plain error, so we are precluded by Tenth Circuit precedent from considering the merits of AGNM's argument.

### B. The Borgeses' Cross–Appeals

On cross-appeal, the Borgeses ask us to reverse the bankruptcy court's conclusion that AGNM acted reasonably when it provided Corley with a $9.4 million payoff figure and that AGNM had clean hands. They also ask us to reverse the bankruptcy court's denial of their counterclaims for breach of the obligation of good faith and fair dealing, interference with contracts, violation of New Mexico's Unfair Practices Act, and prima facie tort. Finally, they ask us to strike the bankruptcy court's post-petition interest calculation as premature.

### 1. The Bankruptcy Court's finding that AGNM acted reasonably under the circumstances is not clearly erroneous.

 The Borgeses argue that the bankruptcy court erred in holding that AGNM acted reasonably when it demanded a $9.4 million payoff from Corley despite its repeated representations that it would accept a $6.3 million payoff on the Cow Note.[134] They claim this conclusion was based on three findings that have no evidentiary support: 1) AGNM believed itself to be undersecured in 2009 based on the deficiency in the 2006 Mortgage, 2) AGNM had no room to give up the remainder of the net sale proceeds given its collateral position, and 3) AGNM received short notice of the terms of the sale.[135] They claim that in March 2009, AGNM believed it had remedied the 2006 Mortgage so it could not have concerns of being undersecured. They argue that the bankruptcy court erred in relying on its 2012 avoidance of the Corrected Mortgage to conclude that AGNM believed itself to be undersecured. They also argue that the bankruptcy court improperly relied on its own analysis and discussion of the worldwide economy to justify AGNM's action.[136] They say no expert testified and no evidence was proffered regarding the impact of the economy on the value of the collateral.

We find these arguments unpersuasive. As an initial matter, the Borgeses have framed the bankruptcy court's conclusion and their arguments in such a way that suggests AGNM demanded $9.4 million from Corley after repeatedly representing that it would accept $6.3 million to pay off the Cow Note.[137] To be clear, the bankruptcy court did not conclude that AGNM demanded $9.4 million from Corley.[138] It found that AGNM provided Corley with a

---

134. Brief of Borgeses at 1, 15–17.

135. *Id.* at 16–17.

136. *Id.* at 19.

137. *See id.* at 15–16, Subtitle Heading III.A.

138. This is but one instance of the Borgeses' mischaracterizing or misapprehending the bankruptcy court's findings or conclusions. We decline to address each and every factual misapprehension. If this Court has not addressed a specific alleged factual error, it means we deem it to lack sufficient merit or importance to warrant individual attention.

$9.4 million payoff figure for all the debts the Borgeses owed it to indicate that it was entitled to all the proceeds from the herd sale ($7.6 million minus closing costs), and not just the $6.3 million to pay off the Cow Note. AGNM neither demanded nor expected Corley to pay it $9.4 million. We conclude that the bankruptcy court's finding that AGNM demanded the net sale proceeds is not clearly erroneous.

With respect to AGNM's representations, the bankruptcy court found that "at no time did AGNM promise to accept $6.3 million from the sale of the herd, or indeed any amount less than the full sale proceeds." [139] But even if AGNM represented that it would accept $6.3 million to pay off the Cow Note, that is not the same thing as a representation that it would give up $1.3 million of its collateral. AGNM may have represented that it would provide a $6.3 million payoff figure for the Cow Note to Corley, but that misrepresentation (if made) likewise did not constitute a representation that it would give up $1.3 million of its collateral.

Second, the bankruptcy court's discussion regarding the economy was entirely appropriate. The record abounds with evidence regarding the economy's impact on the Borgeses and other dairy farmers in 2008. Maria testified at length regarding the economy's effect on the dairy industry, as did Messrs. Yoakum, Moorman, and Logsdon.[140] All four testified that in 2008, milk prices had dropped, while feed prices had risen. Indeed, the economy played a major role in the Borgeses' decision to get out of the dairy business.[141] Messrs. Yoakum, Moorman, and Logsdon testified that most dairy loans had been downgraded because of what was going on in the dairy industry. Even if these testimonies were not presented, the bankruptcy court was well within its discretion to take judicial notice of the economy during the relevant times.[142]

Third, contrary to the Borgeses' assertion, the bankruptcy court did not rely upon its 2012 avoidance of the Corrected Mortgage to conclude that AGNM believed itself to be undersecured in March 2009. The bankruptcy court's conclusion was more general—it found that AGNM was worried about whether the 220 acres would continue to collateralize its loans, and this worry was reasonable.[143] The evidence was that by March 2009, AGNM had experienced difficulties with the loan and felt it needed to examine its collateral position and double-check its legal documents.[144] AGNM discovered the deficiency in the

---

**139.** Appealed Order at 45, *in* AGNM App. at 472.

**140.** Maria Borges has been in the dairy business since 1971. She certainly would have qualified as an expert on the dairy industry.

**141.** May 25, 2012 Trial Tr., Test. of Maria Borges at 28–29, *in* Borgeses App. at 4256–57 (future milk prices not good, big banks collapsing, losing sales overseas, feed prices rising at fast pace, no future in the dairy business).

**142.** 29 Am.Jur.2d *Evidence* § 66 (2014) (courts may take judicial notice of generally known financial and business conditions at given times; generally depressed condition of

a major national industry is a proper subject of judicial notice).

**143.** Appealed Order at 28, *in* AGNM App. at 455. To bolster this conclusion, the bankruptcy court performed a loan to value analysis, using figures from various documents and simple math. We agree that there was no expert testimony to support the court's statement that a loan to value ratio of 1:1.44 is not especially secure, but this error was harmless. It did not change the fact that discovery of the deficiency would have been worrisome for AGNM.

**144.** Oct. 11, 2011 Deposition Tr. of John Logsdon at 14, *in* Borgeses App. at 1147.

2006 Mortgage before the scheduled closing, it was concerned about the error, it contacted counsel to determine how to correct the error, and based on counsel's advice, filed the Corrected Mortgage.[145] We find it highly improbable that this concern would have disappeared upon filing the Corrected Mortgage. AGNM undoubtedly hoped the Corrected Mortgage fixed the error, but it nonetheless would have remained concerned that it had not. Subsequently taking the legal position that filing the Corrected Mortgage was valid would not have nullified AGNM's concern in March 2009. The bankruptcy court's statement that "AGNM reasonably was worried about whether the 220 acres would continue to collateralize its loan, a worry that turns out to be justified" simply means AGNM's concern was later validated. Whether or not that concern turned out to be true is irrelevant for purposes of determining the reasonableness of that belief.

Fourth, the evidence regarding AGNM's belief as to its collateral position varied. As the trier of fact, the bankruptcy court has the duty to sort through conflicting facts, weigh the evidence, and draw reasonable inferences and deductions from that evidence.[146] We must give due regard to the opportunity of the trial court to judge the weight and credibility of the evidence.[147]

AGNM's loan status reports (form 1100) contained values for the real estate and its optional advance analyses contained values for the herd. AGNM's optional advance analyses in 2009 valued the herd between $9.3 million to $10.15 million.[148] As the bankruptcy court noted, the offers from the Borgeses' attempted sales for the herd in 2008 and 2009 (all in the $6 million range) were nowhere close to the $9 to $10 million valuations stated in AGNM's loan analyses, which suggested the parties had overvalued the herd.

This in turn caused the bankruptcy court to wonder about the reliability of the two real estate appraisals referenced in AGNM's loan status reports.[149] The 2006 appraisal valued the real estate at $4.45 million, while the 2008 appraisal valued the real estate at $5.35 million, a more than $ 1 million dollar appreciation. The bankruptcy court concluded the 2006 appraisal was more accurate than the 2008 appraisal since it had been generated in less volatile times. We cannot say that this inference was unreasonable. Nor was it unreasonable to infer that AGNM harbored doubts about the values of the collateral as stated in its books.[150] Even if AGNM believed it was oversecured, the discovery of the deficiency in the 2006 Mortgage undoubtedly increased its anxiety about whether all of its loans remained completely secured.

Fifth, the bankruptcy court's conclusion that the shortness of notice also justified AGNM's insistence on all the sale proceeds

---

**145.** *Id.*

**146.** *In re Snook,* 134 B.R. 424, 426 (D.Kan. 1991).

**147.** *In re King Res. Co.,* 651 F.2d 1326, 1337 (10th Cir.1980).

**148.** Trial Exs. 55, 72, and 114, *in* Borgeses App. at 1792, 1825, and 1931.

**149.** Trial Ex. 42, *in* Borgeses App. at 1764; Ex. W (2006 appraisal referenced in Appealed Order at 10, 42, *in* AGNM App. at 437, 469).

**150.** We agree with the bankruptcy court that AGNM's books showed as strong a collateral position as possible (*i.e.,* maintained high values for the Borgeses' collateral) in order to maintain its borrowing base with FCBT and that AGNM likely harbored doubts about those high values. *See* Appealed Order at 42 n. 33, *in* AGNM App. at 469.

is supported by the evidence.[151] The Borgeses claim that AGNM knew of the sale as early as February 23, 2009, two days before the Borgeses and Corley entered into the formal written sale contract, and almost three weeks before the March 13, 2009 closing. AGNM may have known of the proposed sale to Corley, but it certainly did not know the exact terms of the sale. The facts were Maria did not timely provide AGNM with the Contract, and she never notified AGNM she had authorized the assignment of the milk checks to Corley on February 27, 2009.[152] And even though the Contract had been executed, when Moncrief asked for the contract on March 2, 2009, Frank told her that they were still trying to finalize the deal.[153]

The Borgeses argue that the bankruptcy court erred in implying they were somehow not forthright.[154] We find this particular argument specious. The bankruptcy court specifically stated:

> The Court does not find that Ms. Borges was acting in bad faith or trying to conceal anything from AGNM, only that in her determination to work out of her deep financial problems, she was less than meticulous about keeping her lender fully and immediately advised of everything that she planned to do and that she did do.[155]

Finally, and most importantly, we have carefully reviewed the record in this case. We recognize that the record contains some conflicting evidence.[156] However, within that evidence there is a substantial basis to support the bankruptcy court's finding that AGNM acted reasonably in providing Corley with a payoff figure for all three loans and insisting it receive all the proceeds from the proposed sale:

1) All three notes were cross-collateralized.

2) J & M Dairy operated at a loss in 2008.[157] The Borgeses, like other dairy farmers, were struggling due to the decline in milk prices and rise in feed costs. As a result, they decided to get out of the dairy business.

3) On November 8, 2008, "based on the continued operating losses and the decision to discontinue operations, liquidate the herd, and sell the facility," AGNM downgraded the Borgeses' loans from "9A" to "11A." [158] An "11" risk rating means the loan was substandard, and "A" means if there is a default, a loss can be expected.[159] Raising a loan's risk rating meant the loan quality had deteriorated.

4) On December 24, 2008, AGNM considered the Borgeses' loans distressed

---

151. Appealed Order at 46, 48, *in* AGNM App. at 473, 475.

152. May 25, 2012 Trial Tr., Test. of Maria Borges at 81–82, *in* Borgeses App. at 4309–10.

153. Trial Ex. AA, Email dated Mar. 2, 2009, *in* Borgeses App. at 3207.

154. Brief of Borgeses at 30.

155. Appealed Order at 47, *in* AGNM App. at 474.

156. For example, the parties disagree as to the time of the delivery payoff figures, and

when or if the Cow Note was declared in default.

157. The dairy's financial statements show a loss from operation of almost $800,000 as of September 30, 2008. May 29, 2012 Trial Tr., Test. of Maria Borges at 136, *in* Borgeses App. at 4528.

158. Trial Ex. 28, Email dated Nov. 3, 2008, *in* Borgeses App. at 1685.

159. Jan. 24, 2012 Deposition Tr. of John Logsdon at 143, *in* Borgeses App. at 1458.

after a previous deal fell apart.[160]

5) On March 2, 2009, AGNM was on "high alert" after hearing a rumor that the Borgeses had asked Brett Bynum to give AGNM a contract for $4.1 million when the contract was to have been $7.1 million.[161] Whether or not the rumor was true is irrelevant; it, nonetheless, explains AGNM's state of mind. Moorman testified that this rumor "[made AGNM] concerned that all the funds would not be coming to AG New Mexico for our collateral and that we needed to be very cautious[.]" [162]

6) The Borgeses signed the Contract on February 25, 2009, yet provided the contract to AGNM on March 10, 2009, a little more than 60 hours before the scheduled closing.[163] That contract contained one paragraph that reflected a cash deal and did not clearly set out how proceeds would be distributed.

Against this backdrop, the bankruptcy court's finding that AGNM acted reasonably under the circumstances is not clearly erroneous. Simply put, the Borgeses

owed AGNM a lot of money, the notes were cross-collateralized, times were difficult, J & M Dairy was a hemorrhaging business on life support, and AGNM never committed to waiving the cross-collateral provision.

2. **The bankruptcy court did not err in denying the Borgeses' counterclaims for breach of good faith and fair dealing, interference with contracts, and violation of New Mexico's Unfair Practices Act.**

a. **Breach of Obligation of Good Faith and Fair Dealing and Interference with Contracts.**

 The Borgeses argue that the dismissal[164] of their counterclaims for breach of the obligation of good faith and fair dealing, and for interference with the Corley Contract, the CWT Contract, and the Lewis Contract should be reversed because the bankruptcy court erred in finding that AGNM's actions were reasonable.[165] For the reasons stated above, we

---

**160.** Trial Ex. 36, AGNM Letter Dated Dec. 24, 2008, *in* Borgeses App. at 1699; Trial Ex. 38, Loan Analysis Comments dated Dec. 30, 2008, *in* Borgeses App. at 1703.

**161.** Trial Ex. AA, Email dated Mar. 2, 2009, *in* Borgeses App. at 3207; May 21, 2012 Trial Tr., Test. of Moorman at 34, *ll.* 6–8, in Borgeses App. at 3654 ("[that e-mail] kind of put us on what I would call high alert in watching this sales transaction . . .").

**162.** May 21, 2012 Trial Tr., Test. of Moorman at 34, *ll.* 3–5, *in* Borgeses App. at 3654.

**163.** AGNM repeatedly asked the Borges to provide it with the Contract. Trial Ex. 80, Email dated Mar. 3, 2009, *in* Borgeses App. at 1841; Trial Ex. 84, Email dated March 9, 2009, *in* Borgeses App. at 1851.

**164.** The bankruptcy court both "dismissed" and "denied" the counterclaims. In its analysis, the bankruptcy court dismissed the counterclaims (*see* Appealed Order at 70, 74, 77, 79, 89, and 97, *in* AGNM App. at 497, 501,

504, 506, 516, and 525), but in its conclusion, it denied the counterclaims except as incorporated as offsets (*id.* at 108, *in* AGNM App. at 536.) In the Judgment, the bankruptcy court granted in part the Borgeses counterclaim for breach of contract and denied the remaining counterclaims with prejudice (*see* Judgment at 4, ¶¶ 15–16, *in* AGNM App. at 541). Because the bankruptcy court's decision was after a trial on the merits, the counterclaims were denied, rather than dismissed.

**165.** We review the bankruptcy court's factual findings for clear error and its legal conclusions *de novo. Roberts v. Printup,* 595 F.3d 1181, 1186 (10th Cir.2010). We review mixed questions of law and fact under the clearly erroneous or de novo standard, depending on whether the mixed questions involves primarily a factual inquiry or the consideration of legal principles. *Id.*

reject this argument. Because the Borgeses failed to establish AGNM acted unreasonably, in bad faith, or unjustifiably, we conclude the bankruptcy court properly denied these counterclaims.

### b. New Mexico Unfair Practices Act ("UPA")

■ Under the New Mexico Unfair Practices Act ("UPA"), "[u]nfair or deceptive trade practices [or] unconscionable trade practices in the conduct of any trade or commerce are unlawful." [166] A movant must prove four elements in order to maintain a claim under the UPA: 1) defendant made a false or misleading oral or written representation, 2) the false or misleading representation must have been knowingly made, 3) the conduct occurred in the regular course of the representer's trade or commerce, and 4) the representation must have been of the type that deceived or misleads any person.[167]

■ The Borgeses claim that AGNM knowingly made false or misleading representations to convince them to sell their cattle. Specifically, they claim that AGNM misrepresented that 1) after the cattle were sold, the Facility Note would be restructured to a lower adjustable interest rate with annual payments, 2) it would accept $6.1 million to release the lien on the cattle, and 3) the net proceeds above $6.1 million (the "Excess") could be used to pay off the Borgeses' accounts payable.[168] On appeal, they argue that the bankruptcy court only considered the misrepresentations relating to restructuring the Facility Note and wholly disregarded evidence that AGNM led them to believe the payoff for the Cow Note was $6.1 million, while AGNM secretly planned to demand a $9.4 million payoff.[169] We disagree. The bankruptcy court did consider whether AGNM made false or misleading representations regarding the payoff and the Excess, and determined that "there [was] no evidence that AGNM made any *actual* promises with regard [to] the payoff amount or interest rate of the facility loan[,]" [170] and "that AGNM did not make any actual, definite promises regarding the facility loan or the proceeds of the cattle sale." [171]

The Borgeses cite to numerous emails between AGNM personnel as evidence that AGNM represented that the payoff amount for the cattle was $6.1 million.[172] However, these emails only proved that Frank requested a payoff on the Cow Note on February 18, 2009, with a payoff date of February 20, 2009, and that Moncrief gave him a $6.1 million payoff for both dates. The Borgeses would have the court infer that previously providing them with a $6.1

**166.** N.M. Stat. Ann. § 57–12–3 (1978).

**167.** *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 811 P.2d 1308, 1311 (1991).

**168.** Closing Arguments in Support of the Borgeses' Counterclaims and Adversary Complaint And in Opposition to the Plaintiffs AG New Mexico's Complaint and PCA's Motion for Abandonment (Borgeses' Written Closing Arguments") at 35–38, *in* Borgeses App. at 4689–92.

**169.** Brief of Borgeses at 43.

**170.** Appealed Order at 72, *in* AGNM App. at 499. The bankruptcy court noted that the Borgeses relied on the same set of operative facts to support both their UPA and promissory estoppel claims.

**171.** *Id.* at 73, *in* AGNM App. at 500.

**172.** Borgeses' Written Closing Arguments at 6, ¶ 26 (citing Trial Exs. 58–61), *in* Borgeses App. at 4660, 1796–1804. The payoff for the Cow Note was $6.1 million as of February 20, 2009 (Trial Ex. 60, in Borgeses App. at 1801) and approximately $6.3 million as of March 12, 2009 (Trial Ex. 99, in Borgeses App. at 1892).

million payoff for the Cow Note constituted a representation that AGNM would not provide Corley with a payoff for all three loans. These emails do not support an inference or conclusion that AGNM made any representation as to the payoff it would supply for closing. We conclude that the bankruptcy court's finding on AGNM's payoff representations is not clearly erroneous.

Likewise, the evidence supports the bankruptcy court's finding that AGNM made no representations as to the Excess. The emails that referenced the Borgeses using the Excess to pay off their accounts payable did not constitute representations by AGNM.[173] Rather, the emails' authors were summarizing the Borgeses' proposal to AGNM—that the Borgeses anticipated the sale of the cattle would pay off the Cow Note and all their payables, and leave them enough to restructure the Facility Note and avoid a tax liability on the cattle sold. The bankruptcy court's finding that AGNM did not make any representations regarding the Excess is not clearly erroneous.

Because the Borgeses failed to establish AGNM knowingly made false or misleading representations, we conclude the bankruptcy court properly denied the Borgeses' UPA counterclaim.

### c. Prima Facie Tort

■■■■ In New Mexico, to prevail on a claim for prima facie tort, the plaintiff must show: 1) an intentional, lawful act by defendant; 2) an intent to injure the plain-

tiff; 3) injury to plaintiff; and 4) insufficient justification for the defendant's acts.[174] "Prima facie tort is not intended to provide a remedy for every intentionally caused harm, rather, it is a remedy for acts committed with intent to injure the plaintiff and without justification."[175] Courts must balance the intent to injure against both the justification for the injurious act and the severity of the injury in determining whether a prima facie tort has been committed.[176] "If 'there is no evidence of an intent to injure, there is no need to proceed with the balancing test.'"[177] "Intent to injure is distinct from intent to commit the act which results in injury."[178]

■■■■ The bankruptcy court determined that it was unable to find that AGNM intended to injure the Borgeses, and that, most, if not all, actions taken by AGNM were justifiable, justified, and generally not culpable. The Borgeses argue that the bankruptcy court erred in finding AGNM had no intent to injure them.[179] They point to Moncrief's email dated March 12, 2009, as evidence that AGNM knew that sending a payoff for all three loans would stop the sale. This email, however, does not prove intent to injure the Borgeses, but rather a calculated decision by AGNM to insure it would receive the excess proceeds.

The evidence showed that AGNM decided to provide Corley with the payoff figure

---

**173.** Trial Exs. 51 and 53, *in* Borgeses App. at 1783–85, 1789.

**174.** *Schmitz v. Smentowski*, 109 N.M. 386, 785 P.2d 726, 734 (N.M.1990).

**175.** *Kitchell v. Pub. Serv. Co. of N.M.*, 126 N.M. 525, 972 P.2d 344, 348 (1998).

**176.** *Id.*

**177.** *Id.* (quoting *Lexington Ins. Co. v. Rummel*, 123 N.M. 774, 945 P.2d 992, 995 (1997)).

**178.** *Lexington Ins. Co.*, 945 P.2d at 995.

**179.** *Rocky Mountain Wholesale Co. v. Ponca Wholesale Mercantile Co.*, 68 N.M. 228, 360 P.2d 643, 649 (1961) (intent to injure is a question of fact).

for all three loans shortly before the scheduled closing.[180] Clearly, AGNM intended to send the $9.4 million payoff figure, but this does not prove intent to injure. Yoakum testified he ordered the $9.4 million payoff because he "wanted to make sure that anybody that was looking at [ ] that, [ ] understood the total debt owed by the Borgeses."[181] He also testified that AGNM sent the second fax concerning a $ 6.3 million payoff to indicate "what it would take to pay the cattle off and anything above ... would then go apply to the rest of the debt. [The excess] was not to be turned [ ] loose."[182] The bankruptcy court found credible Yoakum's testimony regarding his concerns to protect and preserve AGNM's rights in the collateral and that he was not trying to torpedo the deal. We will not disturb the bankruptcy court's credibility determinations.[183]

We conclude that the bankruptcy court's finding that AGNM lacked an intent to injure is not clearly erroneous. Because the Borgeses failed to establish an element of prima facie tort, the bankruptcy court properly denied this counterclaim.

### 3. The bankruptcy court did not abuse its discretion in rejecting the Borgeses' affirmative defense of unclean hands.[184]

Unclean hands is an equitable doctrine that requires the party seeking relief not itself be guilty of fraudulent, illegal, or inequitable conduct for which he seeks relief.[185] Whether the facts and circumstances in a given case warrant its application rests in the sound discretion of the trial court.[186]

The Borgeses argue the bankruptcy court erred in concluding that AGNM had clean hands because AGNM wrongfully held receipts from the sale of cattle in a no-interest bearing account in violation of the terms of the notes. They contend that AGNM is not entitled to recover anything from them because AGNM is guilty of inequitable conduct in the matter for which it seeks relief. The bankruptcy court found that the "Funds Held" account and retroactive interest rate increase were mere contract violations and "not so much fraudulent or inequitable" conduct.[187] Because these contract violations were easily remedied and had little effect on AGNM's foreclosure request, we find no reason to conclude that the bankruptcy court abused

**180.** Trial Ex. 86, Email dated March 10, 2009, *in* Borgeses App. at 1857.

**181.** May 22, 2012 Trial Tr., Test. of Bill Yoakum at 33, *ll.* 8–11, *in* Borgeses App. at 3710.

**182.** *Id.* at 34, *ll.* 10–17, *in* Borgeses App. at 3711.

**183.** *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two ... witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); Fed. R. Bankr.P. 8013.

**184.** We decline to address the mirrored affirmative defense of breach of the obligation of good faith and fair dealing.

**185.** *Home Sav. & Loan Ass'n v. Bates*, 76 N.M. 660, 417 P.2d 798, 799 (1966).

**186.** *Id.; see also Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 958 (10th Cir.2009) (reviewing application of unclean hands doctrine for abuse of discretion).

**187.** *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990) (" 'Inequitable conduct' in commercial life means breach *plus* some advantage-taking[.]").

its discretion by not applying the doctrine of unclean hands.

### 4. The bankruptcy court's interest calculation was not premature.

The Borgeses argue that because the actual value of the encumbered property was not litigated below, the question of whether post-petition interest is permitted under § 506(a) is premature. Alternatively, they argue that if AGNM was undersecured, it is not entitled to interest on the unsecured portion of the collateral pursuant to § 506(b). We need not address these arguments because the bankruptcy court did not award AGNM postpetition interest under § 506.[188]

The bankruptcy court's interest calculation was a part of its § 502 analysis to determine the amount of the claim fixed as of the date of the filing of the petition and whether the claim was allowable.[189] The bankruptcy court reduced AGNM's claim for accrued interest based on its conclusion that 1) AGNM wrongfully deposited monies in a "Funds Held" account and did not apply it to the Cow Note and 2) AGNM improperly increased the interest rate retroactively on the Cow Note. It also deducted 720 days of accrued interest because AGNM's proof of claim 16–1 for the Cow Note included interest that had accrued after the petition date. As to postpetition interest, the bankruptcy court merely recalculated the per diem rate and reduced it according to the evidence.[190] The bankruptcy court allowed accrued postpetition interest at the rate of $439.23 per diem,

but it did not determine that AGNM was entitled to postpetition interest under § 506(b).[191]

## IV. Conclusion

After thoroughly reviewing the extensive record and considering the evidence as a whole, we are not persuaded by either parties' arguments on appeal. We AFFIRM the bankruptcy court's determination that the Borgeses are entitled to avoid AGNM's claimed lien on the Additional 220 Acres under § 544(a)(3). As to the water rights, we conclude that AGNM's perfection theory based on the filing of the 2006 Mortgage was not raised below, thus it was forfeited. And because AGNM has not show plain error, we will not consider this new theory of perfection. As to the theory of perfection based on the change of water rights ownership forms, we conclude that the bankruptcy court correctly ruled that these forms were not properly recorded and did not perfect AGNM's interest in the water rights. Accordingly, we AFFIRM the bankruptcy court's avoidance of the assignment of water rights.

As to the cross-appeal, we conclude that the bankruptcy court's finding that AGNM acted reasonably under the circumstances is not clearly erroneous. Thus, we AFFIRM the bankruptcy court's denial of the Borgeses' counterclaims for breach of the obligation of good faith and fair dealing, interference with contracts, violation of New Mexico's Unfair Practices Act, and prima facie tort. We likewise AFFIRM the bankruptcy court's rejection

---

188. Section 506(b) provides that a creditor is entitled to add postpetition interest to the allowed amount of its secured claim only to the extent of the oversecurity. If there is no oversecurity, the creditor cannot add postpetition interest to its secured claim.

189. 11 U.S.C. § 502.

190. Appealed Order at 61, *in* AGNM Ap. at 488 ("The accrual of interest postpetition should be reduced to [ ] $439.23.").

191. *See In re Harrison,* 987 F.2d 677, 681 (10th Cir.1993) (A request for valuation under § 506 must be made pursuant to motion under Bankruptcy Rule 3012.).

of the Borgeses' unclean hands affirmative defense. Finally, we conclude that the bankruptcy court's postpetition interest calculation was not premature or clearly erroneous, and AFFIRM it.