**FILED**
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

**February 21, 2024**

**Anne M. Zoltani**
**Clerk**

NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| IN RE THEODORE WILLIAM WHITE, JR. and PORSCHA SHIROMA, | BAP No. UT-22-008 |
| Debtors. | |
| _____ | |
| | Bankr. No. 14-25727 |
| J. KEVIN BIRD, Chapter 7 Trustee, | Adv. No. 16-2089 |
| Plaintiff - Appellant, | Chapter 7 |
| v. | |
| LYNN E. WARDLEY, | OPINION |
| Defendant - Appellee. | |

_____

Appeal from the United States Bankruptcy Court
for the District of Utah
_____

Before **ROMERO**, Chief Judge, **MICHAEL**, and **PARKER**, Bankruptcy Judges.
_____

**MICHAEL**, Bankruptcy Judge.

Value, like beauty, is often in the eye of the beholder.[2] Reasonably equivalent value, perhaps even more so. But not always. Dollar-for-dollar exchanges are seldom

---

[1] This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

[2] For those who disagree, the author responds with a single word: cryptocurrency.

questioned; this appeal represents one such rare occasion. The facts before us are undisputed. Monies in excess of $750,000 were loaned. These loans were secured by an asset worth more than $15 million. Later, the asset was (at least partially) liquidated, and $750,000 was repaid. Long after the money was paid, a chapter 7 bankruptcy case was filed, and the trustee filed an action against the lender arguing that the receipt and repayment of $750,000 did not constitute reasonably equivalent value and was a fraudulent transfer under the Utah Uniform Fraudulent Transfer Act ("Utah UFTA").[3] The Bankruptcy Court found that both the receipt of $750,000 and the dollar-for-dollar repayment thereof constituted reasonably equivalent value, granted summary judgment to the lender, and sent the party alleging fraud (the bankruptcy trustee) home. Upon review, considering the material facts in the light most favorable to the trustee, and looking at the applicable law afresh, we find summary judgment appropriate, and affirm the Bankruptcy Court.

## I.    Factual and Procedural History

For several months prior to December 2010, Theodore White ("White") solicited Lynn E. Wardley ("Wardley") to invest $4 million in American Benefits Company, LLC.[4] This company was one of several limited liability companies wholly owned or

---

[3] Utah Code Ann. §§ 25-6-5 and 25-6-6. After the trustee filed his complaint, Utah amended and renamed its UFTA to the Uniform Voidable Transactions Act (the "Act"). This amendment changed the numbers and title of the Utah UFTA but left the text largely intact. This Court's citations reflect the Utah UFTA as applicable at the time of the trustee's adversary filing. The relevant statues under the Act can be found at Utah Code Ann. §§ 25-6-202 and 25-6-203.

[4] *Pretrial Order (Proposed)*, Uncontested Facts ¶ 36, *in* Appellant's App. at 871.

managed by White engaged in the business of marketing and selling discount medical cards. At the time, none of White's companies were profitable.[5] Nevertheless, White believed his business model, properly funded and executed, would generate millions of dollars.[6] To get things started, White was in desperate need of a capital investment.

On December 6, 2010, Wardley agreed to loan White money on the condition they form a new entity, ABC Club, LLC ("ABC Club"). They further agreed White would manage ABC Club, take a minority ownership interest in the company, and receive a salary for his efforts.[7] Following this agreement, Wardley advanced funds which allowed White to begin overseeing its day-to-day operations. By April of 2011, Wardley had advanced over $500,000 to White specifically for use in operating ABC Club.[8] The funds were deposited directly in ABC Club's accounts. White did not have a personal bank account at any point during this time.

On April 7, 2011, White, Wardley, and C. David Hester ("Hester")[9] executed an operating agreement for ABC Club memorializing the agreed terms of the loans (the "Operating Agreement").[10] The Operating Agreement was made effective as of December 6, 2010, the same day as the initial agreement. Per the Operating Agreement, ownership interests in ABC Club were assigned: 82% to Wardley; 15% to White; and 3%

---

[5] *Memorandum Decision Re: Trustee's Motion for Partial Summary Judgment (Reasonably Equivalent Value) (Docket No. 112)* at 3, *in* Appellant's App. at 1416 (hereinafter *September Summary Judgment Memorandum*).

[6] *Id*. at 4, *in* Appellant's App. at 1417.

[7] *Id*.

[8] *Pretrial Order (Proposed)*, Uncontested Facts ¶ 44, *in* Appellant's App. at 873.

[9] Hester is not party to this appeal or the underlying litigation.

[10] Operating Agreement, *in* Appellant's App. at 883-98.

to Hester. As part of the Operating Agreement, White agreed—per Wardley's requirement—to be personally liable for repayment of $750,000 of the monies loaned to White under the following terms:

> The Members acknowledge that Lynn Wardley has lent and may, in his discretion, lend cash to the Company. The Members anticipate that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest thereon at the agreed rate. Further, Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White in the form of his employment by and promotional ownership interest in the Company. Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans, up to $750,000.00, such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. This is an irrevocable and unconditional promises [sic] to pay and not a guarantee of the Company's performance. The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves. Mr. White holds a judgment in litigation captioned *Theodore W White, Jr.* v. *Richard McKinley,* Case No. 05-0203-CV-W-NKL, U.S. District Court for the Western District of Missouri, Western Division. Mr. White hereby partially assigns his interest in such judgment to Mr. Wardley to secure the foregoing personal guaranty, and shall cause his attorneys in that litigation, Brian F. McCallister of The McCallister Law Firm, Kansas City, Missouri, to confirm such judgment and acknowledge this partial assignment and agree to distribute such sum upon demand from net proceeds payable to Mr. White from amounts collected on such judgment, subject to prior claims, in satisfaction of such personal guarantee.

(the "Guaranty").[11] To secure the Guaranty, the Operating Agreement included a partial assignment (the "Assignment") of White's interest in a $15 million judgment against the

---

[11] *Id.* at 18-19, *in* Appellant's App. at 895-96.

City of Lee's Summit, MO (the "Judgment").[12] White and Wardley testified without contradiction that the advances of funds from Wardley were direct loans to White.[13]

Separate from, but contemporaneous with, the Operating Agreement, White and Wardley signed an Executive Employment Agreement, wherein they agreed White would be employed by ABC Club to manage its day-to-day operations and oversee product development and marketing.[14] The Executive Employment Agreement granted White discretion to set his own salary,[15] which he did at an average rate of nearly $26,000 a month between December 2010 and September 2011. Between December 16, 2010, and July 8, 2011, Wardley advanced $868,000 to White for ABC Club.[16] Of the advances, almost one-third of the monies were used to fund White's salary.[17]

During the roughly nine months ABC Club operated, the company never made mass commercial shipment of discount medical cards,[18] or any distributions to Wardley.

---

[12] Operating Agreement at 18-19, *in* Appellant's App. at 895-96.

[13] *See* Wardley's Dep. 81:21-82:1, *in* Appellant's App. at 444-45 ("And my opinion is I never lent it to ABC Club. I lent it to [White]."); White's Dep. 152:25-153:2, *in* Appellant's App. at 1027-28 ("In essence, I advanced every dollar that had been advanced by Mr. Wardley to the company to further the company[.]").

[14] *Executive Employment Agreement*, *in* Appellant's App. at 899-903.

[15] *Id.* at 2, *in* Appellant's App. at 900 ("The Company may pay [White] a salary in an amount and at a frequency as determined by the Manager of the Company in his sole discretion.").

[16] *See Pretrial Order (Proposed)*, Uncontested Facts ¶ 44, *in* Appellant's App. at 873-74.

[17] *See September Summary Judgment Memorandum* at 8, *in* Appellant's App. at 1420-21.

[18] Whether the company made *any* commercial shipment of cards is disputed. At the very least it never made commercial shipments sufficient to generate significant revenue. *See Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgment (Docket No. 58)* at 28, *in* Appellant's App. at 699 (hereinafter *March Summary*

In July 2011, White directed $750,000 of the proceeds from the Judgment be paid to Wardley (the "Transfer"), fully satisfying his obligations under the Guaranty and the Assignment. After the Transfer, Wardley briefly continued loaning money to White and ABC Club, but soon informed White funds would no longer be advanced for the purpose of paying White's salary. Shortly thereafter, White chose to leave the company. By all accounts, operation of ABC Club ceased after White's departure. Given that White had already made good on his financial obligations to Wardley under the Guaranty and Assignment, matters between Wardley and White were concluded. Or so they thought.

Almost three years later, on May 30, 2014, White filed a petition for relief under chapter 7 of the United States Bankruptcy Code. J. Kevin Bird was appointed as Chapter 7 trustee ("Trustee"). The bankruptcy case proceeded for over two years before Trustee filed an adversary proceeding against Wardley seeking avoidance of the Guaranty and recovery of the Transfer.

On November 17, 2017, Wardley filed a motion for summary judgment seeking dismissal of all claims against him ("Wardley's motion").[19] On March 28, 2018, the Bankruptcy Court entered an order granting in part and denying in part Wardley's motion.[20] The Bankruptcy Court concluded the Guaranty was valid and enforceable as a matter of law, and that White received reasonably equivalent value for the Transfer,

_____

*Judgment Memorandum*). In any event, this dispute does not affect resolution of the case before us.

[19] *Lynn E. Wardley's Motion for Summary Judgment and Memorandum in Support of Same*, *in* Appellant's App. at 29-53.

[20] *Order On Lynn E. Wardley's Motion for Summary Judgment (Docket No. 58)*, *in* Appellant's App. at 708-10.

namely, the elimination of his liability under the Guaranty.[21] Later, on a subsequent

motion for summary judgment filed by Wardley, the Bankruptcy Court entered an order

concluding White had incurred the Guaranty on the effective date of the Operating

Agreement—December 6, 2010.[22]

After another two years of slow, protracted, and piecemeal litigation (much to the

chagrin of the Bankruptcy Court),[23] Trustee filed his second motion for partial summary

judgment ("Trustee's motion").[24] Trustee's motion sought a judicial determination that

White incurred the Guaranty for less than reasonably equivalent value. The Bankruptcy

Court denied Trustee's motion and granted summary judgment in favor of Wardley on

the issue. In its memorandum opinion, the Bankruptcy Court determined as a matter of

law that White was a direct beneficiary of all funds advanced by Wardley[25] and received

reasonably equivalent value in exchange for the Guaranty.[26] The Bankruptcy Court later

---

[21] *March Summary Judgment Memorandum* at 35, *in* Appellant's App. at 706. The Bankruptcy Court made its conclusion under the presumption the Guaranty was not avoidable as a fraudulent transfer as the issue was not before the court at the time. *See id.* at 22, *in* Appellant's App. at 693.

[22] *See Memorandum Decision on Wardley's Motion for Summary Judgment (Docket No. 58) as to when the Debtor Incurred the ABC Club Guaranty for purposes of the Utah Uniform Fraudulent Transfer Act* at 18, *in* Appellant's App. at 834.

[23] *See September Summary Judgment Memorandum* at 25, *in* Appellant's App. at 1438.

[24] *Motion for Partial Summary Judgment (Reasonably Equivalent Value)*, *in* Appellant's App. at 836-54.

[25] *September Summary Judgment Memorandum*, at 14, *in* Appellant's App. at 1427.

[26] *Id.* at 12-25, *in* Appellant's App. at 1427-38.

entered a final order dismissing Trustee's remaining claims for relief.[27] Trustee timely

appealed this order and all preliminary summary judgment orders.[28]

## II.     Appellate Jurisdiction

This Court has jurisdiction to hear timely-filed appeals from "final judgments,

orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the

parties elects to have the district court hear the appeal.[29] Neither party elected to have this

appeal heard by the United States District Court for the District of Utah. The parties have

thus consented to appellate review by this Court.

A decision is considered final "if it 'ends the litigation on the merits and leaves

nothing for the court to do but execute the judgment.'"[30] Nothing remains for the

Bankruptcy Court's consideration. Thus, the appealed orders are final for purposes of

review.

## III.     Standard of Review

This Court reviews orders granting summary judgment de novo applying "the

same legal standard as was used by the bankruptcy court to determine whether either

party is entitled to judgment as a matter of law."[31] Summary judgment is appropriate

---

[27] *Final Judgment*, *in* Appellant's App. at 1447-48.

[28] *Notice of Appeal*, Nos. 14-25727, 16-02089 (D. Utah May 4, 2022), ECF No. 156.

[29] 28 U.S.C §§ 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[30] *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233 (1945)).

[31] *LTF Real Estate Co., Inc. v. Expert South Tulsa, LLC (In re Expert South Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014), *aff'd*, 619 F. App'x 779 (10th Cir. 2015) (quoting *Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 180 (10th Cir. 2012), *aff'd*, 749 F.3d 895 (10th Cir. 2014)).

where a party shows there is no genuine dispute of a material fact, and the moving party is entitled to judgment as a matter of law.[32] No genuine issue of fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."[33] In making its determination, the Court must draw all justifiable inferences in favor of the non-moving party.[34]

## IV.     Discussion

This appeal stems from an adversary proceeding filed by Trustee to recover the Transfer as a constructively fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 550,[35] and the Utah UFTA. Section 544(b) allows a trustee to avoid transfers of the debtor's property if under applicable state law the transfer would be voidable by a hypothetical unsecured creditor holding a claim.[36] In such circumstances, § 550 permits the trustee to recover the transfer from the transferee.[37]

Under the applicable provision of the Utah UFTA,[38] a transfer or obligation incurred by a debtor is fraudulent as to a creditor where the debtor received less than

---

[32] Fed. R. Civ. P. 56(c) made applicable by Fed. R. Bankr. P. 7056.

[33] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[34] *In re Grandote Country Club Co., Ltd.*, 252 F.3d 1146, 1149 (10th Cir. 2001) (quoting *Thournir v. Meyer*, 909 F.2d 408, 409 (10th Cir. 1990)).

[35] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[36] § 544(b).

[37] § 550.

[38] The operative sections of the Utah UFTA read as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

reasonably equivalent value in exchange for such transfer or obligation.[39] A

determination of reasonable equivalence is a fact intensive inquiry.[40] The Bankruptcy

Code does not define reasonably equivalent value; rather, courts have been tasked with

defining the term.[41] This Court has previously considered reasonably equivalent value to

---

incurred the obligation:…(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Utah Code Ann. § 25-6-5.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if: (a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.

Utah Code Ann. § 25-6-6.

[39] Constructively fraudulent transfers under the Utah UFTA require a showing that the debtor was either insolvent at the time of the transfer or became insolvent as a result. *Id.* §§ 25-6-5, 25-6-6. The Bankruptcy Court denied summary judgment on the issue of insolvency and reserved the issue for trial. The issue of insolvency was never settled as Trustee's claim was dismissed once the Bankruptcy Court ruled that White received reasonably equivalent value in exchange for the transfer to Wardley. This appeal arises from the final decision dismissing all Trustee's claims. However, the litigants did not brief or argue the issue of insolvency on appeal and this Court will not consider the issue. *See In re Tevis*, 347 B.R. 679, 690 (9th Cir. BAP 2006) ("Ordinarily, an appellate court will not consider a matter on appeal that is not specifically and distinctly argued in appellant's opening brief.").

[40] *West v. Christensen (In re Christensen)*, Nos. 11-30743, 13-2248, 2014 WL 1873401, at *4-5 (Bankr. D. Utah May 8, 2014).

[41] *McCanna v. Burke*, 197 B.R. 333, 338-39 (D.N.M. 1996). *See also Mostoller v. Sexton (In re Sexton)*, Nos. 19-33412, 20-3033, 2021 WL 1259256, at *4 (Bankr. E.D.

10

"generally mean[] that the debtor has received value that is substantially comparable to the worth of the transferred property."[42] An inquiry into reasonably equivalent value asks: "(1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received."[43]

The Utah UFTA similarly does not define reasonably equivalent value, but at least one Utah court has said "the primary consideration in analyzing the exchange for value for any transfer is the degree to which the [debtor's] net worth is preserved."[44] Under Utah law "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."[45] Value

---

Tenn. Apr. 5, 2021) (noting reasonably equivalent value is not an "esoteric concept" and that the analysis for receipt of reasonably equivalent value is "fundamentally one of common sense.") (first quoting *VFBLLC v. Campbell Soup Co.,* 482 F.3d 624, 631 (3d Cir. 2007); and then *Lindquist v. JNG Corp. (In re Lindell),* 334 B.R. 249, 256 (Bankr. D. Minn. 2005)).

[42] *LTF Real Estate Co., Inc. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014), *aff'd*, 619 F. App'x 779 (10th Cir. 2015) (footnote omitted).

[43] *Rajala v. Gardener*, 661 F. App'x 512, 516-17 (10th Cir. 2016) (unpublished) (citing *In re Expert S. Tulsa, LLC*, 522 B.R. at 652).

[44] *Wells Fargo Rail Corp. v. Black Iron, LLC (In re Black Iron, LLC)*, 609 B.R. 390, 411 (Bankr. D. Utah 2019), *amended on reconsideration*, 616 B.R. 903 (Bankr. D. Utah 2020), and *aff'd sub nom. Utah Iron v. Wells Fargo Rail*, 634 B.R. 122 (D. Utah 2021), *aff'd in part, vacated in part, remanded sub nom. In re Iron*, No. 21-4116, 2023 WL 8710653 (10th Cir. Dec. 18, 2023) (internal quotations omitted).

[45] Utah Code Ann. § 25-6-4(1).

11

is determined as of the date of the transfer or obligation without the benefit of hindsight.[46]

On summary judgment, the Bankruptcy Court concluded: 1) the loans by Wardley were loans to White; 2) White received reasonably equivalent value for the Transfer based on the substantial benefits he received from the loans; and 3) the Guaranty was an unconditional and irrevocable promise to pay. The Bankruptcy Court concluded, in the alternative, that even if the debt was somehow contingent, the Assignment of the Judgment constituted an alternate legal basis for payment of the $750,000 on demand.

Trustee asserts White did not receive reasonably equivalent value for either the Transfer or the Guaranty for three reasons. First, Trustee argues that ABC Club, and not White, was the direct beneficiary of the loans and White did not receive reasonably equivalent value in exchange for the Guaranty. As part of this argument, Trustee alleges the Bankruptcy Court erred in not shifting the burden of proof to Wardley.[47] Second, even if White was a direct beneficiary of monies loaned, Trustee contends those benefits were not enough to constitute reasonably equivalent value in exchange for the Guaranty.

---

[46] *See Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) (value is measured at the time of the exchange); *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126 (5th Cir. 1993) (hindsight is not the appropriate measurement by which to calculate value), *abrogated on other grounds as recognized in In re Diaz*, 972 F.3d 713, 720 n.6 (5th Cir. 2020); *Cooper v. Ashley Commc'ns NC, Inc. (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990) ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question.").

[47] Trustee devotes substantial time in his brief to this issue. We do not, as it is a red herring. The decision of the Bankruptcy Court and our affirmance are supported by facts not in material dispute.

Finally, Trustee makes a convoluted argument that White's obligation under the Guaranty was contingent and that none of the contingencies were met. We find no merit in these arguments.

## A. White directly benefited from Wardley's loans.

The Bankruptcy Court determined White was a direct beneficiary of the loans based largely on the fact White and Wardley both considered the loans *made directly to* White.[48] In reaching this conclusion, in addition to testimony of the parties to this effect, the Bankruptcy Court relied on the following facts that are not in material dispute:

1. White's salary was funded by the loan proceeds;

2. White did not have a bank account other than ABC Club's;

3. White had sole authority and discretion over the loan proceeds; and

4. White received an equity interest in the business.

Trustee claims the Bankruptcy Court erroneously relied upon these facts and that White was not a direct beneficiary of the $750,000 loan because: 1) Wardley made the loans directly to ABC Club, and 2) Wardley had discretion to continue loaning money to ABC Club.

Trustee's arguments are unpersuasive. He apparently fails to appreciate that *but for* Wardley's loans there would have been no ABC Club, no lucrative salary, and no chance to create a potentially profitable business. *But for* Wardley's loans, White would not have had the opportunity to play his hand at the medical discount card business. As

---

[48] *September Summary Judgment Memorandum* at 14, *in* Appellant's App. at 1427.

13

White testified, accepting the loans and applicable terms gave him a chance at his business and "fifteen percent of something [was] better than fifteen percent of nothing."[49] Trustee's argument that the money was deposited into ABC Club's accounts—and therefore not a benefit to White—is unavailing. The money had to be placed somewhere, and the ABC bank account was the only place White had to put it.

Trustee's second argument that Wardley had discretion to continue loaning money is met by this Court with a resounding "so what?" Creditors loan money as a matter of course and have the discretion to stop loaning money as a matter of course, depending upon the terms of the credit agreement. The undisputed facts of this case are that White agreed to guaranty the repayment of $750,000 in funds loaned by Wardley to White for use in ABC Club operations, Wardley loaned well in excess of that amount for that purpose, and, ultimately, White repaid the $750,000 from a source of funds that had been specifically pledged as security for that purpose. There is nothing remarkable or nefarious about any of this. We agree with the Bankruptcy Court that "[i]t is form over substance to say that [White] guaranteed the third-party debt of ABC Club, and thus any benefits from the Guaranty only flowed indirectly to him."[50]

**B. White received reasonably equivalent value in exchange for the Guaranty.**

The Bankruptcy Court concluded White received value in the form of opportunity to fund his start-up company, a salary amounting to $235,000 over a nine-month period, a

---

[49] White's Dep. 62:8-62:11, *in* Appellant's App. at 1005.

[50] *September Summary Judgment Memorandum* at 15, *in* Appellant's App. at 1427.

15% ownership interest in ABC Club, and a lucrative incentive structure. Trustee argues none of these benefits constituted value for White. His argument attempts to parse each source of value and chip away at the deal White and Wardley struck. In reality, these benefits were not individualized in the Operating Agreement or, presumably, in the minds of the parties. White received reasonably equivalent value in exchange for the Transfer because he was promised all of these benefits in exchange for his Guaranty. Rather than painstakingly go through each of Trustee's arguments, we think the United States Court of Appeals for the Third Circuit's ("Third Circuit") analysis in *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*) best illustrates Trustee's misguidance.[51]

In *In re R.M.L., Inc.*, the Third Circuit discussed under what circumstances opportunity to receive future economic value would constitute reasonably equivalent value.[52] There, the Third Circuit considered the question of value where a debtor's investment ultimately failed to improve its condition. The court stated, "so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, [the court] will find that value has been conferred."[53] The Third Circuit further reasoned such a rule would encourage entrepreneurial debtors to take risks without unduly restricting creditors' interests in a debtor's estate.[54] Recognizing it is

---

[51] 92 F.3d 139, 145-148, 152 (3d Cir. 1996).

[52] *See generally id.*

[53] *Id.* at 152 (first citing *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995); then citing *In re Fairchild Aircraft Corp.*, 6 F.3d 1119 (5th Cir. 1993); and then citing *cf. In re Morris Commc'ns NC, Inc.*, 914 F.2d 458 (4th Cir. 1990)).

[54] *Id.* at 152.

inherently difficult to measure value when an investment is ultimately not successful, the Third Circuit stated the best solution is to "determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate positive returns."[55] We agree.

Trustee contends ABC Club's chance of success was "unreasonably remote;"[56] however, he provided no evidence to the Bankruptcy Court in support of his position. Nor did Trustee make allegations ABC Club was a sham or hoax in his complaint.[57] Barring some evidence to the contrary the case law does not convince us to find ABC Club was doomed from the start. White and Wardley believed ABC Club would be profitable.[58] White believed the business would be worth millions. While the company never hit, during its lifespan White received numerous benefits including the opportunity to run a business that could have resulted in long term prosperity. Where this Court agrees with Trustee is that transfers or obligations at issue in reasonably equivalent value cases should be viewed without the benefit of hindsight.

The facts before us show White and Wardley agreed Wardley would loan White funds that White could then use to operate his business. In addition to pursuing his entrepreneurial dreams, White was promised a salary (which he was paid), and a 15% ownership interest in ABC Club—which could grow to 25% if certain benchmarks were

---

[55] *Id.*
[56] Appellant's Opening Brief at 27.
[57] *See* Trustee's Amended Complaint, *in* Appellant's App. at 1-17.
[58] "The members anticipate that the Company will make profits in its business. . . ." Operating Agreement at 18, *in* Appellant's App. at 895.

met.[59] The salary, regardless of its actual value, is of special import because, as the Bankruptcy Court stated, "it [could] be used to pay debts, [] avoid incurring additional debt, [] acquire property, or [] be garnished by creditors."[60] These benefits provided White with reasonably equivalent value for his promise to repay the loans. We therefore conclude the Bankruptcy Court correctly determined White received reasonably equivalent value in exchange for the Guaranty.

### C. The Bankruptcy Court properly concluded White received reasonably equivalent value for the Transfer.

Trustee contends White's obligation under the Guaranty was a contingent liability and not an antecedent debt. A contingency or condition is "an event, not certain to occur, which must occur . . . before performance under a contract becomes due."[61] An antecedent debt is a debt incurred at some time preceding a transfer in payment on the debt.[62] We agree with the Bankruptcy Court's analysis and also conclude the plain language of the Operating Agreement provided White absolutely and unconditionally promised to repay $750,000 of the monies advanced by Wardley.

Under Utah law, transfers which secure or satisfy antecedent debts provide "value."[63] There is no minimum percentage or requirement a transfer be dollar-for-dollar

---

[59] Incentive Agreement, *in* Appellant's App. at 904-05.

[60] *See September Summary Judgment Memorandum* at 16, *in* Appellant's App. at 1429.

[61] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1000 (Utah 2016) (quoting *McArthur v. State Farm Mut. Auto. Ins.*, 274 P.3d 981, 988 (Utah 2012)).

[62] *See* 5 *Collier on Bankruptcy* ¶ 547.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2023).

[63] Utah Code Ann. § 25-6-4(1).

for a transfer to constitute reasonably equivalent value.[64] However, in this case, White received loans in excess of $750,000 and repaid $750,000 through the Transfer, all of which was credited against the amounts he owed. It was a true dollar-for-dollar exchange. Such an exchange almost always constitutes reasonably equivalent value.[65]

Confronted with this reality, Trustee argues White's liability under the Guaranty did not constitute an antecedent debt. Instead, Trustee argues White's liability was secondary and entirely contingent upon the occurrence of up to four conditions. Under these contrived conditions White's liability would only manifest after (1) ABC Club had commercially shipped the medical cards; (2) twelve months had passed since such shipment; (3) ABC Club had dissolved; and (4) the shortfall between ABC Club's distributions to Wardley and the outstanding Guaranty amount had been calculated by the company's accountant. Taken to its illogical conclusion, Trustee's argument is that, unless these four conditions were fully met, White owed Wardley nothing, and the funds were nothing more than a gift. The plain language of the Operating Agreement shows the

---

[64] *West v. Christensen (In re Christensen)*, Nos. 11-30743, 13-2248, 2014 WL 1873401, at *4 (Bankr. D. Utah May 8, 2014).

[65] *See Spradlin v. Monday Coal, LLC. (In re Licking River Mining, LLC)*, 571 B.R. 241, 262 (Bankr. E.D. Ky. 2017) ("Payment of valid antecedent debt, as a matter of law, is not a constructively fraudulent transfer as dollar-for-dollar reduction of indebtedness amounts to 'reasonably equivalent value' and 'consideration' under the pertinent statutes.") (citing § 548(d)(2)(A)); *Se. Waffles, LLC. v. U.S. Dep't of Treasury (In re Se. Waffles, LLC)*, 702 F.3d 850, 855 (6th Cir. 2012) ("[D]ollar-for-dollar reduction in debt is sufficient to establish equivalent value for purposes of the fraudulent-transfer statutes[.]"); *Brandt v. Am. Nat'l Bank & Tr. Co. (In re Foos)*, 188 B.R. 239, 245 (Bankr. N.D. Ill. 1995) ("as a matter of law" dollar-for-dollar payments on account of antecedent debt "are for reasonably equivalent value and not avoidable"), *aff'd in part, rev'd in part on other grounds*, 1996 WL 563503 (N.D. Ill. Sept. 23, 1996).

18

parties did not intend to limit White's liability. The Operating Agreement includes a section dedicated to White's repayment of the loans.[66] The language unambiguously states White's promise to pay is "irrevocable and unconditional…and *not a guarantee of the Company's performance*."[67] The Guaranty plainly evinces the parties' contemplation that White would repay the loans regardless of the operation or success of ABC Club. White testified he believed he owed the debt and he paid the debt under this belief.[68] On the other hand, applying the Trustee's scenario, White could have made sure ABC Club did not perform, walked away, kept the money, and left Wardley holding a $750,000 bag. The argument struggles to pass the "straight face" test.[69] Trustee also contends, for the first time on appeal, White's liability was contingent *upon default* by a primary obligor. This argument was wholly absent at the trial court level and is therefore waived.[70]

---

[66] Operating Agreement at 18-19, *in* Appellant's App. at 895-96.

[67] *Id.* (emphasis added).

[68] White's Dep. 188:2, *in* Appellant's App. at 1036.

[69] "The **straight face test** (also **laugh test** or **giggle test**) is a test of whether something is legitimate or serious based on whether a given statement or legal argument can be made sincerely, without any compulsion to laugh. The phrase goes back to about 1987." Wikipedia, *Straight-Face-Test,* https://en.wikipedia.org/wiki/Straight_face_test (last visited Jan. 14, 2024).

[70] *See AG N.M. v. Borges (In re Borges*), 510 B.R. 306, 330-33 (10th Cir. BAP 2014) (arguments raised for the first time on appeal may only be grounds for reversal where the lower court commits plain error); *Hale v. Big H Const., Inc*., 288 P.3d 1046, 1059-60 (Utah Ct. App. 2012) ("To preserve an issue for appellate review, a party must raise the issue at trial in a timely, specific fashion and introduce supporting evidence or relevant legal authority in order to 'put the [trial court] on notice of the asserted error' so that the trial court has an opportunity to correct it.") (quoting *O'Dea v. Olea*, 217 P.3d 704, 709 (Utah 2009)).

The Court notes, however, even if we were to consider the issue of default, the outcome of this case would not change. Trustee relies on *In re Clore,* 547 B.R. 915 (Bankr. C.D. Ill. 2016) for the proposition that ABC Club must have first been in default

Lastly, the Bankruptcy Court concluded the Assignment created a second, noncontingent method of repayment. Trustee contends the Assignment was not an absolute assignment, but was an assignment for purposes of security only, and cannot be construed to expunge the contingencies to White's liability. Having found the arguments regarding the alleged contingencies to be untenable, we respond to the "absolute assignment versus assignment for the purposes of security" argument with yet another resounding, "so what?" White had a right to payment under the Judgment that he partially pledged to Wardley to the extent of $750,000. That pledge included an unequivocal statement that Wardley could collect the $750,000 from the Judgment "on demand." We conclude White continued to bear the risk of loss until ABC Club earned profits sufficient to pay the amount guaranteed to Wardley. ABC Club never earned meaningful profits. Therefore, White remained liable on the entire debt, which was satisfied in part by the Transfer.[71]

**Conclusion**

The Bankruptcy Court's final order and decisions respectively granting and denying Wardley's and Trustee's motions for summary judgment are affirmed in all respects.

---

for White's liability to ripen. *In re Clore* does not apply to this case. Rather, *In re Clore* concerned whether the liability on the principal of a loan not in default counted against the debtor's eligibility to convert to a chapter 13 bankruptcy case. *Id.* at 919. In that case, the court concluded the debt was contingent solely to prevent the liability from counting against the debtor's maximum unsecured debt limit.

[71] The monies advanced by Wardley in excess of $750,000 are not at issue in this appeal.